**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **NUVECTRA CORPORATION,** | § | **Case No. 19-43090** |
| | § | |
| | § | |
| Debtor.[1] | § | |
| | § | |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE
AUTOMATIC STAY; AND (IV) SETTING A FINAL HEARING**
**[Relates to Dkt. Nos. 19 and 44]**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

Chapter 11 case of Nuvectra Corporation (the "Debtor"), submits this objection (the "Objection")

to the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the*

*Debtor to Use Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic*

*Stay; and (IV) Setting a Final Hearing* (the "Cash Collateral Motion").[2]

**Introduction**

1.      According to the Debtor's Budget (as defined below), just before the

Petition Date (as defined below), the Debtor had approximately $43.6 million in "Beginning

Cash." Inexplicably, however, **on** the Petition Date, the Debtor made a **$35 million prepayment**

to its pre-petition lenders Oxford Finance LLC ("Oxford") and Silicon Valley Bank ("SVB", and

---

[1] The last four digits of the Debtor's federal tax identification number are: 3847. The location of the Debtor's principal place of business and the service address for the Debtor is: 5830 Granite Parkway, Suite 1100, Plano, TX 75024.

[2] Dkt. No. 19.  Capitalized terms not herein defined shall have the meanings ascribed to them in the Cash Collateral Motion.

together with Oxford, the "Lenders"), leaving the Debtor with only approximately $7.1 million in cash (after certain other payments). Now, without any evidence that the Lenders' collateral is or will diminish in value, and without negotiating any new money in the form of debtor-in-possession financing (a "DIP Loan") or otherwise, the proposed final cash collateral order (the "Proposed Final Order")[3] provides virtually every conceivable adequate protection to the Lenders for the use of Cash Collateral.

2.    Indeed, even after taking $35 million in cash on the Petition Date, the Lenders are trying to abscond what little value is left in the estate. For example, despite the fact that the Lenders do not have a pre-petition lien on intellectual property ("IP"), under the Proposed Final Order, the Lenders receive a lien on IP and all other unencumbered assets, including the proceeds of avoidance actions. Further, under the Proposed Final Order, the Debtor (a) is required to pay interest payments, fees, and expenses to the Lenders, (b) grants a superpriority administrative claim, and (c) turns over all effective control of the case to the Lenders through various restrictions on the Debtor's ability to obtain DIP financing, sell assets, propose a plan, *etc.*

3.    The Proposed Final Order also provides for overly restrictive procedures to challenge the Lenders' claim and liens, no permitted budget variance whatsoever, and underfunded budgets for professional fees and investigations, while simultaneously waiving surcharge rights, the equities of the case exception, and the doctrine of marshalling.

4.    All in all, the proposed adequate protection package would be aggressive even if the Lenders were providing a massive influx of DIP financing, but is particularly

---

[3] Dkt. No. 105.

inappropriate where not only are the Lenders providing no new money to the Debtor, but the Lenders instead seized a $35 million prepayment on the eve of bankruptcy.

5.　　Further, the Lenders have yet to make a showing that they are not already adequately protected by their pre-petition collateral such that it would be justifiable to provide them with liens on unencumbered assets, superpriority claims, *etc*.  After the $35 million eve of bankruptcy prepayment, the remaining outstanding principal balance on the Term Loans (as defined below) is only $10 million.  Yet according to the Debtor's schedules, the alleged value of the alleged pre-petition collateral was $35.4 million as of the Petition Date.[4]  Given that the alleged value of the alleged pre-petition collateral is greater than 350% of the outstanding principal, and that the Debtor is proposing to continue to pay interest payments and the Lenders' fees, the Lenders have shown no need for any further adequate protection even putting aside their receipt of $35 million in cash.

6.　　Alternatively, if the values listed in the Debtor's schedules are too high and the Lenders are undersecured, then they are not entitled to interest payments or the payment of their fees and expenses.

7.　　Accordingly, the Cash Collateral Motion should be denied unless the Committee's proposed revisions to the Proposed Final Order, which are attached as **Exhibit A** (the "Redlined Revised Order"), are made.[5]

## Background

8.　　On November 12, 2019 (the "Petition Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtor is authorized to

---

[4] Dkt. No. 93.

[5] Attached hereto as **Exhibit B** is a clean version of the Redlined Revised Order (the "Revised Order").

continue to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On November 21, 2019, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.[6]

### A.  The Debtor's Pre-petition Capital Structure

10.      Upon information and belief, the Debtor is party to a credit facility (the "Credit Facility") consisting of term loan facilities in an aggregate maximum principal amount of $45 million.[7] Cash Collateral Motion at ¶ 10. The term loan facilities are allegedly fully funded and comprised of (i) a $27.5 million Term Loan A commitment ("Term Loan A"), (ii) a $12.5 million Term Loan B commitment ("Term Loan B"), and (iii) a $5 million Term Loan C commitment ("Term Loan C" and collectively with Term Loan A and Term Loan B, the "Term Loans").  Cash Collateral Motion at ¶ 10.

11.      Upon information and belief, no principal was due on the Term Loans until March 2020; rather, until that time, the Debtor was required to pay only accrued interest.  *Id.*

12.      The Term Loans are allegedly secured by a first priority lien on substantially all of the assets of the Debtor, but, notably, IP is admitted to be excluded as collateral (the "Pre-petition Collateral").  Cash Collateral Motion at ¶ 11.

### B.  The Cash Collateral Motion and Interim Order

13.      On November 14, 2019, the Debtor filed the Cash Collateral Motion.

---

[6] Dkt. No. 50.

[7] The Committee has only recently received copies of the loan documents relating to the Credit Facility, but has not yet verified the details relating to the Credit Facility at this time.

14.     On November 20, 2019, the Court entered an interim order approving the Cash Collateral Motion (the "Interim Order"),[8] which included an interim cash collateral budget as an attachment (the "Budget").

## C.  The $35 Million Eve of Bankruptcy Pre-payment

15.     According to the Budget, the Debtor's "Beginning Cash" for the week of the Petition Date was approximately $43.66 million.  *See* Budget.[9]

16.     **On the Petition Date**, the Debtor made a $35 million prepayment to pay down the principal of the $45 million Term Loans, leaving an outstanding principal balance of $10 million.[10]  This prepayment was made pursuant to an agreement titled the "Consent Under Loan and Security Agreement," whereby the Lenders agreed to 'consent' to the $35 million prepayment. In consideration for this 'consent,' the Lenders did not, however, agree to waive the Prepayment Fee (or other fees).  Rather, the Debtor inexplicably agreed to the $35 million prepayment despite the fact that the Lenders reserved their rights "with respect to the applicable Prepayment Fee that relates to such prepayment and the applicable Final Payment that relates to such prepayment and any other fees that may now or hereafter become due to Collateral Agent or the Lenders pursuant to the Loan Documents."  So the Debtor not only gave the Lenders a $35 million prepayment on the Petition Date, but may be **penalized** for doing so notwithstanding the Lenders' 'consent.'

17.     According to the Budget, after the $35 million prepayment and certain other payments, the Debtor was left with "Ending Cash" of only approximately $7.1 million.  According to the Budget, the Debtor is projected to have operational losses and other disbursements during

---

[8] Dkt. No. 44.

[9] Dkt. No. 44 at Exhibit A.

[10] *See Declaration of John Stuart in Support of Chapter 11 Petition and First Day Pleadings* [Dkt. No. 27] (the "First Day Declaration") at ¶ 22.

the course of this case that would leave it with only $440,000 in "Ending Cash" as of the week

ending May 1, 2020, and, if one extrapolated the projections in the Budget out further, the Debtor

appears to completely run out of cash sometime in May 2020.

### D.  The Proposed Final Order

18.      On December 17, 2019, the Debtor filed the Proposed Final Order.[11]

Despite the fact that the Lenders are providing no new financing, and, indeed, took $35 million in

cash on the Petition Date, the Proposed Final Order grants the Lenders virtually every type of

adequate protection, including, but not limited to (collectively, the "<u>Proposed Adequate</u>

<u>Protections</u>"):

    a.  Adequate protection liens on all of the Debtor's **unencumbered** assets, including
the Debtor's valuable IP and the proceeds of avoidance actions, *see* Proposed Final
Order at ¶ 5;

    b.  First priority replacement liens on the Lenders' currently encumbered Pre-petition
Collateral, *see* Proposed Final Order at ¶ 5;

    c.  Junior liens on the Debtor's assets that are encumbered by parties other than the
Lenders, *see* Proposed Final Order at ¶ 5;

    d.  A superpriority administrative claim with recourse to all of the Debtor's property,
including the proceeds of avoidance actions, *see* Proposed Final Order at ¶ 7;

    e.  The payment of the regularly-scheduled interest payment that is due under the Term
Loans; *see* Proposed Final Order at ¶ 11;

    f.  The payment of the Lenders' fees, costs, and expenses, *see* Proposed Final Order
at ¶ 12;

    g.  No permitted budget variance, *see* Proposed Final Order at ¶ 4;

    h.  Overbearing case controls, including prohibiting the disposition of the Debtor's
assets even where the Lenders do not have pre-petition liens on such assets, *see*
Proposed Final Order at ¶ 13, stringent events of default that would prohibit the
Debtor from, among other things, obtaining DIP financing even if such financing
was on a junior, non-priming basis, *see* Proposed Final Order at ¶ 14, restrictive

---

[11] Dkt. No. 105.

milestones that would give the Lenders control over bid procedures, a sale, any disclosure statement, and any Plan which must satisfy the Lenders' sole discretion, *see* Proposed Final Order at ¶ 14(k), and limits on the Debtor's ability to, among other things, use property outside the ordinary course of business, *see* Proposed Final Order at ¶ 18;

i.  Harsh rights and remedies upon an event of default, *see* Proposed Final Order at ¶ 15;

j.  Strict limits on professional fees and an investigative budget, which will tie the hands of professionals in this case, *see* Proposed Final Order at ¶¶ 16, 17;

k.  Stipulations as to the Lenders' liens, claims, and priority (including a stipulation that a default has occurred), *see* Proposed Final Order at ¶ E;

l.  A short and procedurally onerous challenge period, *see* Proposed Final Order at ¶ 17;

m.  A waiver of surcharge rights, *see* Proposed Final Order at ¶ 20;

n.  A waiver of the doctrine of marshalling, *see* Proposed Final Order at ¶ 21;

o.  A waiver of the equities of the case exception, *see* Proposed Final Order at ¶ 22; and

p.  The waiver of the requirement to file a proof of claim, even though approximately 35% of the Lenders' stipulated claim is made up of mysterious, unexplained, and unaccounted for fees, costs, expenses, interest, penalties, and other non-principal charges, *see* Proposed Final Order at ¶ 26.

## Objection

19.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363]." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

20.     Although the Bankruptcy Code does not expressly define "adequate protection," section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of adequate protection including: (a) a lump sum or periodic cash payments; (b) replacement liens; and (c) administrative priority claims. *See* 11 U.S.C. § 361. Generally, courts decide what constitutes adequate protection on a case-by-case basis. *See In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."). The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case. *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

**A. Based on the Debtor's Schedules, the Lenders are Already Adequately Protected and Cannot Use the Proposed Final Order to Improve Their Position by, Among Other Things, Taking Liens on Unencumbered Property.**

21.     It is axiomatic that the "purpose of providing adequate protection is to protect an entity's interest in property," and that if a party's collateral is worth substantially more than the amount it is owed, such that it has an 'equity cushion,' "the equity cushion may itself provide adequate protection, obviating the need for period payments" or other adequate protections to protect against a diminution in value of the collateral.  3 Collier on Bankruptcy P 361.03 (16th 2019).

22.     Here, after the $35 million prepayment, the remaining outstanding principal balance on the Term Loans (as defined below) is only $10 million.  *See* Budget.  Yet according to the Debtor's schedules, the Debtor had assets that are alleged to be Pre-petition Collateral with the following approximate values:

| Category | Scheduled Value[12] |
|---|---|
| Cash, Cash Equivalents, Financial Assets, Deposits, and Prepayments | $12 million |
| Accounts Receivable | $5.4 million |
| Inventory | $13.7 million |
| Office Furniture, Fixtures, and Equipment | $1.3 million |
| Machinery, Equipment, and Vehicles | $690,000 |
| Real Property | $2.3 million |
| TOTAL | $35.4 million |

23.     Given that the alleged value of the alleged Pre-petition Collateral is greater than 350% of the outstanding principal, and that the Debtor is proposing to continue to pay interest payments and the Lenders' fees, the Lenders have shown no need for any further adequate protection beyond the equity cushion even putting aside that they already received $35 million in cash from the Petition Date prepayment.  *See, e.g.*, *Kost v. First Interstate Bank of Greybill (In re Kost)*, 102 B.R. 829 (D. Wyo. 1989) (collecting cases and finding that equity cushion of 20% or more generally held adequate while equity cushion of under 11% generally held insufficient).  In particular, granting liens on unencumbered assets such as the IP is inappropriate.  *See* Proposed Final Order at ¶ 5.

24.     The Lenders seem to be seeking something more than adequate protection for the diminution in value of their Pre-petition Collateral, if any.  Indeed, the Lenders appear to be inappropriately trying to improve their pre-petition position.  But adequate protection is only "intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the [automatic] stay." *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th Cir. 1986) (emphasis added), *on reh'g*, 808 F.2d 363 (1987), *aff'd sub nom. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,

---

[12] *See Schedule A/B Assets – Real and Personal Property* [Dkt. No. 93] (the "Schedules") at Part 12.

484 U.S. 365 (1988); *see also* Hr'g Tr. 133:1–4, *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ)

(Bankr. S.D. Tex. May 13, 2016) [Dkt. No. 134] (limiting adequate protection to diminution of

value to the extent provided for in section 361).  It is not intended to put the Lenders in a better

position than they bargained for at the time they extended the Term Loans.

25.      Indeed, adequate protection is not intended to provide a windfall by

improving the collateral position of the Lenders, or to protect against losses that the Lenders would

otherwise suffer.  *See In re Ahlers*, 794 F.2d 388, 398 n. 13 (8th Cir. 1986) (adequate protection

does not insure against losses that secured lender would "have to absorb . . . with or without a

bankruptcy"), *vacated on other grounds*, 485 U.S. 197 (1988); *see also Continental Bank v. Rock

Island Ry.*, 294 U.S. 648, 676-77 (1935) ("It may be … that during the period of [bankruptcy]

restraint the collateral will decline in value; but the same may be said in respect of an injunction

against the sale of real estate upon foreclosure of a mortgage…."); *In re Qualitech Steel Corp.*,

276 F.3d 245, 247 (7th Cir. 2001) (no adequate protection against "expenditure stream" necessary

to keep assets "viable"; had the debtor "turned over the keys and deeds to the secured lenders[],

they would have had to bear these costs themselves").

26.      Accordingly, where the Lenders appear to have a huge equity cushion, the

Lenders already received $35 million in cash in the form of a prepayment on the eve of bankruptcy,

and the Proposed Final Order already provides for interest payments and the Lenders' fees, as is

the case here, no further adequate protection is warranted or appropriate.  Specifically, the Court

should not approve any liens or superpriority claims on currently unencumbered assets, such as

the IP (which all parties admit is unencumbered).

**B. On the Other Hand, If the Lenders are Undersecured, They Are Not Entitled to Fees and Expenses.**

27.     The Proposed Final Order provides for the payment of the Debtor's regular monthly interest payment as well as an uncapped amount of fees and expenses. *See* Proposed Final Order at ¶¶ 11 (payment of interest); 12 (payment of fees and expenses).

28.     As noted above, based on the Debtor's Schedules, the Lenders' appear substantially oversecured to the extent that they should not be entitled to all of the adequate protections provided in the Proposed Final Order. But if the Debtor's schedules are incorrect, and the Lenders are undersecured, then the Lenders are not entitled to the payment of fees and interest payments. 11 U.S.C. § 506(b). The Lenders cannot have it both ways. They are either undersecured and entitled to adequate protection, or they are oversecured and entitled to their fees and interest. In any event, no evidence has been presented that the value of the Lenders' Pre-petition Collateral will diminish more than it would outside of bankruptcy. To the contrary, the Lenders will benefit from the use of cash collateral to preserve the value of their Pre-petition Collateral.

**C. Liens and Superpriority Claims on the Proceeds of Avoidance Actions are Inappropriate Given the Questionable Pre-petition Transactions Involving the Lenders.**

29.     Absent extraordinary circumstances, avoidance actions and their proceeds should not be burdened by liens or superpriority lender claims. *See, e.g.*, *McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 33 (N.D.N.Y. 1997), *aff'd*, 142 F.3d 571 (2d Cir. 1998); *Mellon Bank v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 905 (D.N.J. 1987); *see also In re Texas General Petroleum Corp.*, 58 B.R. 357, 358 (Bankr. S.D. Tex. 1986) ("…a debtor-in-possession can[not] assign, sell, or otherwise transfer, the right to maintain a suit to avoid a preference").

30.     This prohibition exists because avoidance actions and their proceeds are statutorily created to benefit unsecured creditors and to ensure an equitable distribution.  *See Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors.") (internal citations omitted); *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997) (noting that Congress enacted avoiding powers to "facilitat[e] the prime bankruptcy policy of equality of distribution among creditors of the debtor."); *McFarland v. Leyh (In re Tex. Gen. Petrol. Corp.)*, 52 F.3d 1330, 1335–36 (5th Cir. 1995) ("'[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits.' . . . The proceeds recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of estate, but are essentially rights held by estate for benefit of unsecured creditors); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm L.P. IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("any recovery [under avoidance powers] is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.").

31.     Here, the Lenders received a $35 million prepayment **on the Petition Date**. The transfer of this substantial amount of cash alone is highly suspect, and almost certainly avoidable given that the Lenders did not even waive the right to penalize the Debtor for making such a prepayment.  Giving the Lenders a lien on the proceeds of avoidance actions which will likely be targeted against them would be extremely inappropriate.  The Lenders were also party to

numerous pre-petition refinancings and/or amendments of the Credit Facility,[13] including receiving a $27.5 million pay down of a prior iteration of the Credit Facility as recently as February 2018,[14] which will need to be investigated.

32.     Additionally, the estate may have other valuable avoidance actions against additional parties.  For example, valuable avoidance actions relating to the March 2016 spin-off of the Debtor by Integer Holdings Corporation, formally known as GreatBatch ("Integer"), and the subsequent onerous contracts between the Debtor and Integer that have "negatively impacted the Debtor's profitability and liquidity" may exist.  *See* First Day Declaration at ¶¶ 8-9.  Because no extraordinary showing necessary to justify a lien on the proceeds of avoidance actions has been made, a lien on avoidance actions is unjustified and inappropriate.

**D. The Proposed Final Order Underfunds Professional Fees and the Committee's Investigative Budget.**

33.     Pursuant to the Proposed Final Order, professional fees of the Debtor and the Committee are limited to the amounts listed in the Budget.  Proposed Final Order at ¶ 16.  As an initial matter, the Budget is unclear as to whose professional fees are included in the line item, and the apportionment of such fees as between various professionals.  However, even if the Budget line-item includes only the Debtor's and Committee's professionals, a $600,000 per month cap is insufficient given the issues in this case.  *See, e.g., In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[F]ailure to provide a reasonable sum for professionals has, in other cases before this Court, left estates, creditors' committees and trustees without the assistance of counsel and the Court without the adversary system contemplated by Congress . . . ."); *In re Tenney Vill. Co*., 104

---

[13] Cash Management Motion at ¶ 9.

[14] Cash Management Motion at ¶ 14.

B.R. 562, 568–69 (Bankr. D.N.H. 1989) (finding cap on fees unacceptably limited the ability of

debtor's counsel to bring actions against postpetition lender).[15]

34.     Further, the Proposed Final Order limits the Committee to just $25,000 in

fees to investigate avoidance and other actions against the Lenders.  Proposed Final Order at ¶

18(b).  Pursuant to Section 1103 of the Bankruptcy Code, the duties of a statutory committee

include, among other things, "investigat[ing] the acts, conduct, assets, liabilities, and financial

condition of the debtor . . . and any other matter relevant to the case . . . and perform[ing] such

other services as are in the interest of those represented." 11 U.S.C. § 1103.

35.     Given the importance of this investigative duty, some courts in complex

cases place no cap at all on an investigative budget.  *See In re TOUSA, Inc.*, No. 08-10928 (Bankr.

S.D. Fla. Jan. 9, 2009) [Dkt. No. 2355] (providing no cap on use of cash collateral to investigate

claims); *In re Radnor Holdings Corp.,* Case No. 06-10894 (Bankr. D. Del. Sept. 2, 2006); *In re

Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008) [Dkt. No. 219]

(same); *In re Delta Air Lines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005) [Dkt. No. 652]

(providing no cap on investigation budget).

36.     But even where a budget is imposed, it is typically significantly higher than

$25,000.  *See, e.g., In re Westmoreland Coal Co.*, Case No. 1835672 (DRJ) (Bankr. S.D. Tex.

Nov. 15, 2018) [Dkt. No. 520] ($150,000 cap); *In re EXCO Resources, Inc.*, Case No. 18-30155

(MI) (Bankr. S.D. Tex. Feb. 22, 2018) [Dkt. No. 348] ($250,000 cap); *In re CJ Holding Co.*, Case

No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 9, 2016) [Dkt. No. 497] ($150,000 cap); *In re

---

[15] The Proposed Final Order also sets a $350,000 cap on all fees "following delivery by the Collateral Agent of the Termination Declaration."  Proposed Final Order at ¶ 16.  There is no provision that would restore the normal, non-default carve out even if the Committee or another party in interest proves that the Termination Declaration was wrongfully delivered, however.  Clarification that the $350,000 cap does not apply in such a scenario should be added as provided in the Revised Order.

*Sandridge Energy, Inc.,* Case No. 16-32488 (DRJ) (Bankr. S.D. Tex. July 5, 2016) (approving an investigation budget of $250,000); *In re Midstates Petrol. Co.*, Case No. 16-32237 (DRJ) (Bankr. S.D. Tex. June 30, 2016) [Dkt. No. 324] ($150,000); *In re Swift Energy Co.*, Case No. 15-12670 (MFW) (Bankr. D. Del. Feb. 2, 2016) [Dkt. No. 224] ($200,000 cap); *In re Samson Res. Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. Jan. 26, 2016) [Dkt. No. 610] ($200,000 cap); *In re Aralez Pharm. US Inc.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. Sept. 14, 2018) [Dkt. No. 98] ($250,000 cap); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 1, 2015) [Dkt. No. 307] (providing no cap on non-cash collateral and $100,000 cap solely as to use of pre-petition collateral or carve-out).

37.     The minuscule budget for such investigations in the Proposed Final Order seeks to limit the Committee's ability to discharge its statutory duties to diligently represent the interests of unsecured creditors, while improperly shielding the Lenders from potential claims. And as detailed above, there are numerous transactions to investigate in this case, not just the $35 million prepayment made to the Lenders on the Petition Date.   Accordingly, the budget for investigations should be increased to at least $75,000.

**E.  The Challenge Period is Too Short and Procedurally Restrictive.**

38.     The Proposed Final Order contains numerous stipulations regarding, among other things, the validity, amount, and priority of the Lenders' liens.  Proposed Final Order at ¶ E. Yet, the Committee and other parties in interest are provided only 60 days to "file a complaint" to challenge such stipulations, or otherwise bring any actions against the Lenders.[16]  Proposed Final

---

[16] Courts often grant longer challenge periods than that requested by the Lenders pursuant to their Proposed Final Order.  *See, e.g., In re Aralez Pharm. US Inc.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. Sep. 14, 2018) [Dkt. No. 98] (approving a 74-day challenge period for the Committee from the date of entry of final DIP order).

Order at ¶ 17.  The deadline is not tolled or extended if the Committee or other party in interest files a motion seeking derivative standing.  *Id.*

39.     However, unlike the Lenders' request here, many courts provide Committees with standing to prosecute challenges without the need to file a motion for derivative standing.  *See, e.g., In re Lockwood Holdings*, Case No. 18-30197 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2018) [Dkt. No. 359]; *In re GMX Resources Inc.*, Case No. 13-11456 (SAH) (Bankr. W.D. Okla. May 6, 2013) [Dkt. No. 323]; *In re Am. Safety Razor, LLC*, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010); *In re PCAA Parent LLC*, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010); *In re Pliant Corp*., Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009); *In re Quebecor World (USA) Inc*., Case No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008).

40.     Here, where there are serious issues to investigate, including the eve of bankruptcy $35 million payment to the Lenders and recent refinancings, the deadline to file challenges should be extended and/or the Committee should be granted automatic standing to prosecute any challenges without the need to file a derivative standing motion.[17]

**F.  The Proposed Final Order Severely Restricts the Debtor's Ability to Carry Out Its Fiduciary Duties.**

41.     Bankruptcy cases should not be run for the sole benefit of a secured creditor.  *See In re Encore Healthcare Assocs*., 312 B.R. 52, 54, 56, 58 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion because court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor" and the secured creditor's goals

---

[17] Alternatively, courts also frequently provide that the filing of a standing motion satisfies the requirement to commence a challenge within a specified period. *See, e.g., In re EXCO Res., Inc*., Case No. 18-30155 (MI) (Bankr. S.D. Tex. Feb. 22, 2018) [Dkt. No. 348]; *In re CJ Holding Co*., Case No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 25, 2016) [Dkt. No. 497]; *In re Midstates Petrol. Co*., Case No. 16-32237 (DRJ) (Bankr. S.D. Tex. June 30, 2016) [Dkt. No. 324]; *In re Lyondell Chem. Co*., Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009); *In re Delta Air Lines, Inc*., Case No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005).

could "easily be accomplished outside of bankruptcy"); *In re Barbara K. Enterprises, Inc.*, 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (denying request for post-petition financing and finding that court should not defer to a debtor's business judgment if the request for financing allows a secured creditor to "leverage the bankruptcy process and unfairly cede[s] control of the reorganization to one party in interest"); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38-39 (Bankr. S.D.N.Y. 1990) (holding that certain case control clauses "skew the carefully designed balance of debtor and creditor protections that Congress drew in crafting Chapter 11" and denying a request for financing because such a request should not be approved "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"); *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors … to one specially crafted for the benefit" of one creditor).

42.     Here, the Proposed Final Order includes numerous restrictive provisions that would effectively tie the Debtor's hands and cede all control of this case to the Lenders.  For example, despite the dire projections regarding the liquidity of the Debtor, the Proposed Final Order would effectively prevent the Debtor from obtaining DIP financing or incurring any other indebtedness except in the Lenders' sole discretion.  *See* Proposed Final Order at ¶¶ 14(b) ("Event of Default" is defined to include the "filing by the Debtor of any debtor-in-possession financing pleadings…not acceptable to and supported by the Collateral Agent in its sole discretion"); 18(b) (cash collateral cannot be used to "incur any new indebtedness without the prior written consent of the Collateral Agent").

43.     And, absent consent of the Lenders in their sole discretion, the Proposed

Final Order would effectively prevent the Debtor from selling assets to generate liquidity as well.

*See* Proposed Final Order at ¶¶ 13 ("the Debtor shall not sell, transfer, lease, encumber or otherwise

dispose of any such Collateral or Pre-petition Collateral without the prior written consent of the

Collateral Agent"); 14(j) ("Event of Default" defined to include the "sale of any portion of the

Debtor's assets outside the ordinary course of business without the prior written consent of the

Collateral Agent, in its sole discretion"); 18(b) (cash collateral cannot be used to "sell or otherwise

dispose of Collateral or the Pre-petition Collateral without the prior consent of the Collateral

Agent" and the Debtor cannot use cash collateral to "pay any fees or similar amounts to any person

who has proposed or may propose to purchase interests in the Debtor without the prior written

consent of the Collateral Agent").

44.     The Proposed Final Order also limits the Debtor's ability to hire an

investment banker, and would effectively prevent the Debtor from making any payments outside

the ordinary course of business.  Proposed Final Order at ¶¶ 14(m) ("Event of Default" includes

the filing of an application to retain an investment banker that is not "reasonably acceptable to the

Collateral Agent"); 18(b) (prohibition on using cash collateral to pay "any costs or expenses that

are not ordinary course operating expenses of the Debtor").

45.     The Proposed Final Order also includes restrictive milestones, including a

deadline to obtain an order approving bid procedures by no later than January 9, 2020.  *See*

Proposed Final Order at ¶ 14(k)(ii).  Yet, the deadline to file the motion to approve bid procedures

is blank, *see* Proposed Final Order at ¶ 14(k)(i), even if the motion was filed today, the Debtor

would need to ask the Court to set any bid procedures motion on less than full notice in order to

comply with the deadline to obtain an order approving same by January 9, 2020.  Thus, such

milestones appear to be designed so that the Debtor fails, and give the Lenders too much control over this case given that the Lenders have the "sole" discretion to approve, among other things, the bid procedures, the form of the order approving same, the order approving a sale, the disclosure statement, and the plan. *See* Proposed Final Order at ¶ 14(k); *cf In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) (denying approval of a plan support agreement because the milestones contained therein were not subject to a fiduciary out and therefore did not allow the debtors to comply with fiduciary duties).

46.      Notably, the remedies for an event of default (an "Event of Default") are overbearing as well. Upon an alleged Event of Default, the Proposed Final Order would allow the Lenders to declare a termination, reduction, or restriction in the use of cash collateral (a "Termination Declaration"), and the use of cash collateral would terminate automatically without any action by the Court after five days unless either the Debtor or Committee obtains a judicial ruling that no Event of Default has occurred. Proposed Final Order at ¶ 15. Notably, the only issue that the Court may consider is whether an Event of Default has occurred, and the five day deadline is not tolled by a request for a hearing. *Id.* In other words, parties would have only five days from the receipt of a Termination Declaration to obtain any discovery, prepare a response, schedule a hearing, and obtain a ruling solely on the issue of whether an Event of Default has occurred or else the use of cash collateral would automatically cease and the automatic stay would be lifted to permit the Lenders to exercise all remedies set forth in the Proposed Final Order and the Loan Documents. *Id.*

47.      This is entirely too restrictive, and combined with the Events of Default and other constricting case controls described above would effectively hand control of this case to the Lenders.

**G. Waiving the Equities of the Case Exception, the Doctrine of Marshalling, and Surcharge Rights is Inappropriate.**

48.    The Bankruptcy Code and/or other applicable law provide various remedies to unsecured creditors and other parties, including surcharge rights pursuant to section 506(c) of the Bankruptcy Code, the so-called "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code, and the doctrine of marshalling.  The Proposed Final Order waives not only the Debtor's ability to access such rights, but the ability of any party in interest to do so.  Proposed Final Order at ¶¶ 20 (Surcharge waiver); 21 (waver of marshalling rights); 22 (waiver of equities of the case exception).

49.    For example, section 506(c) of the Bankruptcy Code permits a debtor to recover, for the benefit of its estate and unsecured creditors, the "reasonable, necessary costs and expenses of preserving, or disposing of, [a secured creditor's collateral] to the extent of any benefit" to such creditor. 11 U.S.C. § 506(c); *see also Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C. (In re Skuna River Lumber, LLC)*, 564 F.3d 353, 355 (5th Cir. 2009) ("[S]ection 506(c) of the Bankruptcy Code . . . allows administrative expenses to be surcharged against a creditor's collateral[.]").

50.    A section 506(c) surcharge waiver should only be granted sparingly, as section 506(c) was "designed to prevent a windfall to the secured creditor at the expense of [a] claimant." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (citation omitted); *In re Spa at Sunset Isles Condominium Ass'n, Inc.*, 454 B.R. 898 (Bankr. S.D. Fla. 2011); *In re Topgallant Lines, Inc.*, No. 89-41996, 1996 WL 33402828, at *2 (Bankr. S.D. Ga. Dec. 23, 1996) ("Section 506(c) is the vehicle to prevent costs of preserving collateral from being shifted from the secured party to the estate. *It insures that unsecured creditors generally will not bear the costs of preserving collateral in which they have no interest.*")

(emphasis added); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."); *First Servs. Grp., Inc. v. O'Connell (In re Ceron)*, 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009) ("[T]he underlying purpose of 11 U.S.C. § 506(c) is that the secured creditor should pay for the benefit it received.") (citation omitted); *Southwest Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 696 (5th Cir. 2015) (stating that "a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost") (citation omitted).

51.     As the Third Circuit explained in *Visual Industries*, section 506(c) "understandably shifts to the secured party, who has benefited from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . ." *In re Visual Indus., Inc.*, 57 F.3d at 325. Furthermore, allowing parties to seek to surcharge the Lenders will not hurt their interests, as any party that seeks to surcharge the Lenders still bears a heavy burden to prove that the expenditure to be surcharged was necessary and beneficial to the Lenders. *See, e.g., Matter of Senior-G & A Operating Co., Inc.,* 957 F.2d 1290, 1299 (5th Cir. 1992) (authorizing surcharge of secured lender for costs of workover of an oil well because such cost was necessary, reasonable, and primarily benefited the secured lender by increasing the value of its collateral).

52.     Indeed, the Supreme Court in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000), warned that such waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for anything but the most compelling of reasons, because immunizing provisions such as these are binding on

all the parties in interest. *Id.* (debtor's decision to waive rights under section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

53.     And other courts have routinely rejected surcharge waivers. *See, e.g.*, Transcript of Hearing at 212:18-22, 213:21-22, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 5, 2014) (Court: "what would occur in the event there was some sort of collateral shut down or collateral transfer to the first lien lenders, and what would that leave behind, and where would the—where would that leave the estate. So, I am not going to approve a 506(c) waiver . . . . I won't approve a 506(c) waiver and if that's a problem, we'll deal with it."); *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (provision in financing order that purports to immunize post-petition lender from Bankruptcy Code section 506(c) is unenforceable); *Kivitz v. CIT Grp./Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (Section 506(c) of the Bankruptcy Code exists so "that unsecured creditors are not required to bear the cost of protecting collateral that is not theirs and to require the secured party to bear the costs of preserving or disposing its own collateral"); *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D.N.H. 1993) (absolute waiver of 506(c) surcharge rights "[wa]s against public policy and unenforceable per se"); *McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (cash collateral order unenforceable to the extent its provisions attempted to immunize post-petition lender from surcharge payment obligations pursuant to section 506(c) of the Bankruptcy Code); *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("The debtor and secured creditor do not constitute a legislature. They have no right to implement a private agreement that effectively

changes the bankruptcy law with regard to the statutory rights of third parties. . . . This court can

discern no basis to allow a secured creditor to avoid [the] application [of section 506(c)].").

54.     Similarly, section 552(b) of the Bankruptcy Code permits a court to refuse,

based on the "equities of the case," to extend a pre-petition lien to postpetition "proceeds, products,

offspring, or profits" of pre-petition collateral. 11 U.S.C. § 552(b). This statutory provision "is

intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts

broad discretion in balancing the interests of secured creditors against the general policy of the

Bankruptcy Code, which favors giving debtors a 'fresh start.'" *In re Cafeteria Operators, L.P.*,

299 B.R. 400, 409–10 (Bankr. N.D. Tex. 2003) (finding that, based on the equities of the case,

secured creditor's lien did not extend to all cash generated postpetition because a portion of such

cash constituted proceeds of unencumbered assets); *see also In re Village Props, Ltd.*, 723 F.2d

441, 444 (5th Cir. 1984) (stating that legislative history regarding the "equities of the case"

exception "indicates its purpose was to cover cases where an expenditure of the estate's funds

increases the value of [a secured creditor's] collateral) (citation omitted); *Nanuet Nat'l Bank v.

Photo Promotion Assocs., Inc. (In re Photo Promotion Assocs., Inc.*), 61 B.R. 936, 939 (Bankr.

S.D.N.Y. 2000) ("The equity exception is meant for the case where the trustee or debtor in

possession uses other assets of the bankrupt estate (assets that would otherwise go to the general

creditors) to increase the value of the collateral.") (internal citation omitted).

55.     Here, as in *Cafeteria Operators*, a portion of—if not all—of the cash

generated by the Debtor are the proceeds, products or profits of its IP, which is unencumbered.

Accordingly, preserving the equities of the case exception is of paramount importance.

56.     Waiving the doctrine of marshalling is inappropriate for similar reasons.

*See In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June

23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.").

### Prayer

WHEREFORE the Committee respectfully requests entry of the Revised Order, or, in the alternative, approval of the Cash Collateral Motion only with amendments substantially similar to those requested herein, and such other and further relief as the Court may deem just and proper, both at law and in equity.

**DATED**:  December 18, 2019

<div style="margin-left:40%">

**THOMPSON & KNIGHT LLP**

By: /s/ *Demetra Liggins*
Demetra L. Liggins
State Bar No. 24026844
Email: demetra.liggins@tklaw.com
811 Main Street, Suite 2500
Houston, TX 77002
Telephone:  (713) 654-8111
Facsimile:  (713) 654-1871

and

Cassandra Sepanik Shoemaker
State Bar No. 24070592
Email: cassandra.shoemaker@tklaw.com
1722 Routh St, Suite 1500
Dallas, TX 75201
Telephone:  (214) 969-1700
Facsimile:  (214) 969-1751

**PROPOSED CO-COUNSEL
FOR THE OFFICIAL
COMMITTEE OF
UNSECURED CREDITORS**

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2019, a true and correct copy of the foregoing was served on all parties entitled to service via this Court's electronic filing system ("<u>ECF</u>") and via First Class Mail on all parties listed on the Master service List.

*/s/ Demetra Liggins*
Demetra L. Liggins