**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | **Chapter 11** |
| | § | |
| **NUVECTRA CORPORATION,[1]** | § | **Case No. 19-43090** |
| | § | |
| **Debtor.** | § | |

**DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION OF NUVECTRA**
**CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Ryan E. Manns (TX Bar No. 24041391)
Toby L. Gerber (TX Bar No. 07813700)
Laura L. Smith (TX Bar No. 24066039)
Shivani P. Shah (TX Bar No. 24102710)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

*Counsel for the Debtor and Debtor In*
*Possession*

Dated: January 29, 2020

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**
**ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A**
**DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY**
**COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL**
**BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The last four digits of the Debtor's federal tax identification number are: 3847. The location of the Debtor's principal place of business and the service address for the Debtor is: 5830 Granite Parkway, Suite 1100, Plano, TX 75024.

## DISCLAIMER

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN OF NUVECTRA CORPORATION.  IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE DEBTOR THAT IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING.    NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO; STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN; EVENTS IN THE CHAPTER 11 CASE AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTOR, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER

APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTOR'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

    A.    Overview of Chapter 11 and the Plan Confirmation Process ............................... 1
    B.    Recovery Analysis and Treatment of Claims and Equity Interests ...................... 2
    C.    Voting on the Plan ............................................................................................ 6

        1.    Impaired Classes Entitled to Vote............................................................ 6
        2.    Unimpaired Classes Deemed to Accept the Plan....................................... 6
        3.    Certain Classes are Deemed to Reject the Plan and Do Not Vote............. 6
        4.    Voting Deadline ..................................................................................... 6
        5.    Voting Instructions................................................................................. 7
        6.    Ballots .................................................................................................. 7
        7.    Additional Information ........................................................................... 7

II.   BACKGROUND INFORMATION .................................................................. 7

    A.    Corporate History............................................................................................ 7

        1.    The Integer Spinoff ................................................................................ 7
        2.    The Divestiture of NeuroNexus & the Merger of Algostim &
            PelviStim........................................................................................... 8

    B.    Overview of the Debtor's Business .................................................................. 9

        1.    Algovita Product Sales........................................................................... 10
        2.    Cost Structure and Liquidity .................................................................. 10

    C.    The Debtor's Prepetition Capital Structure....................................................... 10
    D.    Events Leading to Bankruptcy......................................................................... 11
    E.    Events Occurring During the Debtor's Chapter 11 Case ................................... 12

        1.    Bankruptcy Filing and First Day Relief.................................................... 12
        2.    Schedules and SOFAs and the 341 Meeting ............................................. 14
        3.    Retention and Employment of Ordinary Course Professionals............... 14
        4.    Retention and Employment of Bankruptcy Professionals ...................... 14
        5.    Appointment of Creditors' Committee .................................................... 14
        6.    Usage of Cash Collateral ........................................................................ 14
        7.    The Sale Process .................................................................................... 15

III   THE CHAPTER 11 PLAN ................................................................................ 16

    A     Treatment of Claims and Equity Interests Under the Plan ................................. 16

        1.    Administrative, Professional Fee and Priority Tax Claims ..................... 16

            (a)    Administrative Claims ................................................................. 16
            (b)    Professional Fee Claims............................................................... 16
            (c)    Priority Tax Claims..................................................................... 17

        2.    Classification of Claims and Equity Interests......................................... 17
        3.    Treatment of Claims and Equity Interests .............................................. 18

            (a)    Other Priority Claims (Class 1)................................................... 18
            (b)    Secured Parties' Claim (Class 2) ................................................. 18
            (c)    Other Secured Claims (Class 3).................................................... 19

# TABLE OF CONTENTS
## (continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | (d) | General Unsecured Claims (Class 4) | 19 |
| | (e) | Equity Interests in the Debtor (Class 5) | 19 |
| IV. | MEANS FOR IMPLEMENTATION OF THE PLAN | | 19 |
| | A. | Sources of Consideration for Plan Distributions | 19 |
| | B. | The Plan Administrator | 19 |
| | C. | Wind-Down Estate; Plan Administrator Assets | 20 |
| | D. | Plan Administrator's Fees and Expenses | 21 |
| | E. | Release of Liens | 21 |
| | F. | Prosecution and Resolution of Causes of Action | 21 |
| | | 1. Causes of Action Against Integer Related to the Spin-Off | 22 |
| | G. | Books and Records of the Debtor | 22 |
| | H. | Operations of the Debtor Between the Confirmation Date and the Effective Date | 23 |
| | I. | Establishment of the Administrative Claims Bar Date | 23 |
| | J. | Terms of Injunctions or Stays | 23 |
| | K. | Creditors' Committee | 23 |
| | L. | Debtor's Professionals | 23 |
| | M. | D&O Insurance Policies | 24 |
| V. | PROVISIONS GOVERNING DISTRIBUTIONS | | 24 |
| | A. | Initial Distribution Date | 24 |
| | B. | Subsequent Distributions | 24 |
| | C. | Delivery of Distributions | 24 |
| | | 1. General Provisions; Undeliverable Distributions | 24 |
| | | 2. Unclaimed Property | 25 |
| | D. | Manner of Cash Payments Under the Plan | 25 |
| | E. | Time Bar to Cash Payments by Check | 25 |
| | F. | Compliance with Tax Requirements | 25 |
| | G. | No Payments of Fractional Dollars and Minimum Distributions | 26 |
| | H. | Interest on Claims | 26 |
| | I. | No Distribution in Excess of Allowed Amount of Claim | 26 |
| | J. | Setoff and Recoupment | 26 |
| VI. | DISPUTED CLAIMS | | 27 |
| | A. | No Distribution Pending Allowance | 27 |
| | B. | Resolution of Disputed Claims | 27 |
| | C. | Resolution of Causes of Action | 27 |
| | D. | Estimation of Claims | 27 |
| | E. | Objection Deadline | 28 |

# TABLE OF CONTENTS
### (continued)

**Page**

VII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 28

    A.  Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 28
    B.  Claims Based on Rejection of Executory Contracts and Unexpired Leases ....... 28
    C.  Modification, Amendments, Supplements, Restatements, or Other
       Agreements ................................................................................................ 28
    D.  Insurance Policies ................................................................................ 29
    E.  Reservation of Rights ........................................................................... 29

VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................................ 29
IX.   INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS ... 30

    A.  Compromise and Settlement .................................................................. 30
    B.  Releases................................................................................................. 30

        1.  Releases by the Debtor and the Estate ..................................... 30
        2.  Releases by the Releasing Parties ............................................ 31
        3.  Entry of the Confirmation Order shall constitute the Bankruptcy
           Court's Approval of the releases set forth in Article IX.B ..................... 31

    C.  Exculpation .......................................................................................... 31
    D.  Injunction ............................................................................................. 32

X.    RETENTION OF JURISDICTION ............................................................... 33
XI.   MISCELLANEOUS PROVISIONS ................................................................ 34

    A.  Final Fee Applications .......................................................................... 34
    B.  Payment of Statutory Fees .................................................................... 34
    C.  Modification of the Plan ....................................................................... 34
    D.  Revocation Plan ................................................................................... 35
    E.  Successors and Assigns......................................................................... 35
    F.  Governing Law and Construction.......................................................... 35
    G.  Reservation of Rights ........................................................................... 35
    H.  Section 1146 Exemption ....................................................................... 35
    I.  Section 1125(e) Good Faith Compliance............................................... 36
    J.  Further Assurances............................................................................... 36
    K.  Service of Documents ........................................................................... 36
    L.  Filing of Additional Documents ............................................................ 38
    M.  No Stay of Confirmation Order ............................................................. 38

XII.  RISK FACTORS IN CONNECTION WITH THE PLAN............................................. 38

    A.  Bankruptcy Considerations................................................................... 38
    B.  No Duty to Update Disclosures ............................................................. 39
    C.  Representations Outside of this Disclosure Statement ........................... 39
    D.  No Admission ....................................................................................... 39
    E.  Tax and Other Related Considerations ................................................. 39

# TABLE OF CONTENTS
## (continued)

**Page**

XIII/  PLAN CONFIRMATION AND CONSUMMATION..................................................... 39

A.  The Confirmation Hearing.................................................................................. 39
B.  Plan Confirmation Requirements Under the Bankruptcy Code........................... 40

1.  Best Interests of Creditors........................................................................ 41
2.  Feasibility of the Plan .............................................................................. 41
3.  Acceptance by Impaired Classes ............................................................. 42
4.  Section 1129(b)........................................................................................ 43

(a)  No Unfair Discrimination ............................................................ 43
(b)  Fair and Equitable ....................................................................... 43

XIV.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN 44

A.  Chapter 7 Liquidation ........................................................................................ 44
B.  Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code ..................... 44
C.  Dismissal of the Debtor's Chapter 11 Case ....................................................... 44

XV.  CERTAIN FEDERAL TAX CONSEQUENCES ......................................................... 45

A.  General................................................................................................................ 45
B.  Certain United States Federal Income Tax Consequences to Holders of
Allowed Claims ................................................................................................... 46

XVI.  RECOMMENDATION AND CONCLUSION.............................................................. 47

## I.    INTRODUCTION

On November 12, 2019 (the "Petition Date"), Nuvectra Corporation (the "Debtor") filed with the United States Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now in effect or as hereafter amended (the "Bankruptcy Code"), thereby initiating the above-referenced proceeding (the "Chapter 11 Case").

The Debtor submits this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "Bankruptcy Rules"), in connection with the solicitation of votes on its proposed *Plan of Liquidation of Nuvectra Corporation Under Chapter 11 of the Bankruptcy Code* (the "Plan"), which is attached hereto as **Exhibit 1**. The Debtor believes that confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, its Creditors, and all other interested parties.

This Disclosure Statement and the other documents described herein are being furnished by the Debtor to Creditors in the Chapter 11 Case. This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Chapter 11 Case; (iv) the terms of the Plan; (v) the manner in which Distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplement documents) conflict, the terms of the Plan (including any Plan Supplement documents) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### A.    Overview of Chapter 11 and the Plan Confirmation Process

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidations. Chapter 11 helps a company to maximize recovery to

1

all stakeholders. In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under a plan and (c) contains provisions necessary to implement a plan. Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because equity holders may hold claims and interests in more than one class. The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan by a bankruptcy court binds a debtor and any creditor or interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of a plan or from bringing any causes of action against a debtor in connection with such debt.

After a chapter 11 plan has been filed, the holders of Impaired claims against a debtor are permitted to vote to accept or reject a proposed plan. Before soliciting acceptances of a proposed  plan, section 1125 of the Bankruptcy Code requires the debtor to file a disclosure statement  containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about a proposed plan. This Disclosure Statement is presented to holders of Claims against the Debtor entitled to vote under section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

### B .    Recovery Analysis and Treatment of Claims and Equity Interests

The Plan organizes the Debtor's creditor and equity constituencies into groups called Classes. For each Class, the Plan describes (a) the underlying Claims or Equity Interests, (b) the recovery available to the Holders of Claims or Equity Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Equity Interest or that the rights of Holders under law will be altered in some way and (d) the form of any consideration (*e.g.*, Cash, stock or a combination thereof) that Holders will receive on account of their respective Claims or Equity Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Priority Tax Claims, or Professional Fee Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The table below provides a summary of the classification, treatment, and estimated recoveries of Claims and Equity Interests under the Plan. This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the Claims reconciliation process, and is qualified in its entirety by references to the provisions of the Plan. For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see Section III below—The Chapter 11 Plan:

| Class | Claims and Equity Interests | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|------------------------------|--------|-----------|------------------|--------------------|
| 1. | Other Priority Claims | Unimpaired | Except to the extent that a Holder of an Allowed Other Priority Claim has been paid prior to the Effective Date, or agrees to a different treatment in writing with the Debtor or the Plan Administrator, as applicable, or is the subject of an order entered with respect to the treatment of such Other Priority Claim prior to the Effective Date, each Holder of an Allowed Other Priority Claim, in full satisfaction, release and discharge of and exchange for such Claim, shall receive Cash in an amount equal to the Allowed amount of such priority claim in accordance with section 1129(a)(9) of the Bankruptcy Code, on (or as reasonably practicable thereafter) the later of: (i) the Effective Date; and (ii) the date such Claim in Class 1 becomes an Allowed Claim.  Notwithstanding the foregoing, to the extent the Allowed amount of an Other Priority Claim asserting priority treatment under sections 507(a)(4) and (5) of the Bankruptcy Code exceeds the statutory cap applicable to such Claim, such excess shall be treated as a Class 4 General Unsecured Claim. | No (Deemed to Accept) | 100% |
| 2. | Secured Parties' Claim | Impaired | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that the Secured Parties agree to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of | Yes | TBD |

3

| Class | Claims and Equity Interests | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|------------------------------|--------|-----------|------------------|--------------------|
| | | | and in exchange for the Allowed Secured Parties' Claim (other than the Secured Parties' Deficiency Claim (if any), which shall be treated as a Class 4 Claim (General Unsecured Claim)), the Holders of the Allowed Secured Parties' Claim shall receive Distributions up to the Allowed Secured amount and, at the election of the Secured Parties, the return of any Collateral securing the Allowed Secured Parties' Claim that exists as of the Effective Date; provided, however, that any Collateral that the Secured Parties elect not to have returned to them, shall vest in the Wind-Down Estate (subject to the Secured Parties' Liens) and be liquidated by the Plan Administrator, with the proceeds therefrom distributed to the Secured Parties up to the Allowed Secured amount of the Secured Parties' Claim.  For the avoidance of doubt, the Secured Parties also have a superpriority administrative expense claim in the Chapter 11 Case as provided for in the Cash Collateral Order. | | |
| 3. | Other Secured Claims | Unimpaired | Except to the extent that a Holder of an Allowed Other Secured Claim has been paid prior to the Effective Date, or agrees to a different treatment in writing with the Debtor or the Plan Administrator, as applicable, or is the subject of an order entered with respect to the treatment of | No (Deemed to Accept) | 100% |

4

| Class | Claims and Equity Interests | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|------------------------------|--------|-----------|------------------|---------------------|
| | | | such Claim prior to the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Plan Administrator's option: (i) Cash equal to the Allowed Other Secured Claim; (ii) reinstatement of such Holder's Allowed Other Secured Claim; or (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim. | | |
| 4. | General Unsecured Claims | Impaired | Unless otherwise agreed between the Holder of an Allowed General Unsecured Claim and the Debtor or the Plan Administrator, as applicable, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution of the GUC Recovery. For the avoidance of doubt, Class 4 General Unsecured Claims shall include the Secured Parties' Deficiency Claim (if any). | Yes | TBD |
| 5. | Equity Interests | Impaired | All Equity Interests in the Debtor shall be deemed canceled upon the Effective Date | No (Deemed to Reject) | 0% |

### C.    Voting on the Plan

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan.

Generally, under the Bankruptcy Code, only holders of Claims that are Impaired are entitled to vote to accept or reject a plan. Under section 1124 of the Bankruptcy Code, a class of Claims or interests is deemed to be Impaired under a plan unless (1) a plan leaves unaltered the legal, equitable and contractual rights to which such Claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such Claim or interest, a plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or interest as it existed before the default. An Impaired lass of Creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those Creditors that actually cast ballots vote to accept such plan. Those classes that are Unimpaired are not entitled to vote and are deemed to accept a plan. Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

Any Claim in an Impaired Class that is subject to a pending objection or is scheduled by the Debtor as unliquidated, disputed, or contingent is not entitled to vote unless the Holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan. Only Creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a properly completed ballot by the Voting Deadline will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

### 1.    *Impaired Classes Entitled to Vote.*

Only the Claims in Classes 2 (the Secured Parties' Claim) and 4 (General Unsecured Claims) are Impaired and entitled to vote to accept or reject the Plan.

### 2.    *Unimpaired Classes Deemed to Accept the Plan.*

Under Bankruptcy Code section 1126(f), Claims in Class 1 (Other Priority Claims) and Class 3 (Other Secured Claims) are Unimpaired and the vote of Holders of such Claims in these Classes will not be solicited.

### 3.    *Certain Classes are Deemed to Reject the Plan and Do Not Vote*

Under Bankruptcy Code section 1126(g), the following Classes will receive no Distributions under the Plan and are deemed to have rejected the Plan: Class 5 (Equity Interests). The vote of the Holders of Equity Interests in Class 5 will not be solicited.

### 4.    *Voting Deadline*

The Debtor has engaged Kurtzman Carson Consultants LLC, located at 222 North Pacific Coast Highway, Suite 300, El Segundo, California 90245, as its voting agent ("KCC" or the "Voting Agent") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan. If a Creditor has a Claim classified in a voting Class of Claims under the

Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time. The record date for determining which Creditors may vote on the Plan is March [   ], 2020 (the "Voting Record Date"). The voting deadline is March [ ], 2020 at 5:00 p.m. (prevailing Central Time) (the "Voting Deadline").

        **5.**    *Voting Instructions*

**IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED TO THE VOTING AGENT BY THE VOTING DEADLINE**.

        **6.**    *Ballots*

Creditors must use only the Ballot or Ballots sent to them with the notice of this Disclosure Statement. If a Creditor has Claims in more than one Class, it should receive multiple Ballots. **IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.**

        **7.**    *Additional Information*

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, (iii) the amount of your Claim, (iv) obtaining or replacing a Ballot, or (v) obtaining an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent at (888) 201-2205 (U.S./Canada) or (310) 751-1839.

## II.    BACKGROUND INFORMATION

The Debtor is a neurostimulation medical device company focused on the development and commercialization of its neurostimulation technology platform with a broad range of applications for the treatment of various disorders through stimulation of tissues associated with the nervous system. The Debtor is a public company, and prior to the Chapter 11 Case its common stock traded on the NASDAQ Global Market (the "NASDAQ") under the symbol "NVTR." As set forth in the Debtor's Form 10-Q for the fiscal quarter ended June 30, 2019, filed with the United States Securities and Exchange Commission (the "SEC"), 17,885,297 shares of the Debtor's common stock were issued and outstanding as of July 23, 2019, with no one shareholder beneficially owning more than five (5%) percent of the shares.

### A.    Corporate History

        **1.**    *The Integer Spinoff*

On March 14, 2016, Integer Holdings Corporation, formally known as GreatBatch, Inc. ("Integer"), completed a tax-free spin-off of the Debtor, which was accomplished by the distribution by Integer of all of the Debtor's issued and outstanding shares of common stock to Integer's stockholders on  a pro rata basis (the "Spin-Off"). As a result of the Spin-Off, the Debtor became a separate Delaware corporation. Prior to the Spin-Off, Integer contributed $75

million of cash to the Debtor to fund the Debtor's startup operations, the launch and commercialization of Algovita (defined below), its only neurostimulation product, and the continued development of additional products. At the time of the Spin-Off, the Debtor also entered into a credit facility with its existing lenders to provide for additional funding for its startup operations.

Integer and the Debtor entered into a separation and distribution agreement to effect the Spin-Off. Because the Debtor had limited operations and infrastructure at the time of the Spin-Off, the Debtor also entered into various other agreements with Integer to support the Debtor as a standalone company, which included an exclusive manufacturing and supply agreement, office sublease agreement, restricted intellectual property license agreement, unrestricted intellectual property license agreement, tax matters agreement, transition service agreement, and an employee matters agreement.[2] These agreements provided for, among other things, services to be provided to the Debtor by Integer and the allocation between the Debtor and Integer of assets, employees, liabilities, and obligations (including PP&E, intellectual property, employee benefits, and tax-related assets and liabilities).[3]

The most crucial of the above agreements, for purposes of the Debtor's post Spin-Off commercial business, are (i) the manufacturing and supply agreement with Integer pursuant to which Integer manufactures Algovita and certain of its components on an exclusive basis, and (ii) intellectual property license agreements. In addition to granting Integer the right to exclusively manufacture and supply a majority of the component devices for the Debtor's only product, the terms and commitments of the manufacturing and supply agreement have negatively impacted the Debtor's profitability and liquidity. The license agreements grant Integer broad rights to use the Debtor's intellectual property for minimal annual royalty payments, which have negatively impacted the value of the Debtor's intellectual property and its ability to develop products outside of the neurostimulation field of use.

**2.**     *The Divestiture of NeuroNexus & the Merger of Algostim & PelviStim*

Effective December 31, 2018, the Debtor completed the divestiture of its wholly-owned subsidiary, NeuroNexus Technologies, Inc. ("NeuroNexus"). Specifically, the Debtor sold all of the stock of NeuroNexus to NEL Group, Inc. for gross cash proceeds of $5.0 million, subject to adjustments for various assets and liabilities. As a result, the operations of NeuroNexus have been classified as discontinued operations in the Debtor's financial statements. Moreover, the

---

[2] The Debtor is also a party to various operating lease agreements for office and laboratory facilities and dedicated information technology hardware. The Debtor's lease agreement for its headquarters in Plano, Texas is with Integer and is set to expire in March 2023. The lease for the Debtor's Broomfield, Colorado facility is set to expire in September 2022. Total lease costs from the six months ending June 30, 2019 was $301,000.

[3] The transition services agreement and the employee matters agreement have expired and are no longer in effect.

Debtor recognized a loss of approximately \$0.3 million on the sale of NeuroNexus, which was included in the Debtor's financial statements for the year ending December 31, 2018.

Additionally, on July 2, 2019, the Debtor merged its remaining subsidiaries, Algostim, LLC ("Algostim") and PelviStim, LLC ("PelviStim"), with and into the Debtor and the separate existence of these former wholly-owned subsidiaries ceased. At the time of these mergers neither Algostim nor PelviStim conducted operations, generated revenues, or had operating assets. These mergers had no effect on the Debtor's operations or financial results.

### B.    Overview of the Debtor's Business

The Algovita© spinal cord stimulation ("SCS") system ("Algovita") is the Debtor's first commercial offering and treats chronic pain of the trunk and/or limbs. Algovita is Conformité Européenne ("CE") marked for sales in the European Union and it is approved by the United States Food & Drug Administration (the "FDA") for sales in the United States.  It is estimated that since its launch in 2016 over 5,000 individuals worldwide have been implanted with the Algovita device.

Algovita received CE Mark approval in June 2014 and, until commencement of the Chapter 11 Case, had been commercially available to patients in Germany and several other European countries since November 2014. Algovita received pre-market approval from the FDA in November 2015 when the Debtor was still a subsidiary of Integer.  Algovita was commercially launched by the Debtor in the United States in the first half of 2016 after the Spin-Off. Algovita is reimbursable under existing SCS codes in the United States, the European Union, and Australia. SCS was chosen as the first sector of the neurostimulation market to pursue, as the Debtor, which was wholly-owned by Integer at such time, believed there was an established regulatory and reimbursement pathway and SCS had growth potential due to unmet needs in the SCS market.

The Debtor is in the process of seeking regulatory approval from the FDA for the second application of its neurostimulation technology platform, Virtis© ("Virtis"), a medical device for use in the SNM market for the treatment of chronic urinary retention and the symptoms of overactive bladder. The Debtor filed initial regulatory submissions with the FDA and CE Mark authorities for Virtis in January 2017 and December 2016, respectively. The FDA typically has up to 180 days to review submissions. In July 2018, the Debtor received requests from the FDA and the CE Mark authorities for additional information and data regarding these submissions, which reset the 180-day review process. In January 2019, the FDA advised the Company that its review of Virtis had been further extended beyond the 180–day review period.  In April 2019, the FDA requested additional information and the Debtor submitted supplementary information in October 2019. The Debtor currently expects that Virtis could be approved by the FDA in the first half of 2020. Given the lower volume and reimbursement rates of expected sales in the European Union in the near term, the Debtor is currently evaluating the cost effectiveness of its response to the CE Mark authorities, which would require creating a clinical study plan.

Prior to the Petition Date, the Debtor was continuing its efforts to develop its technology platform for other capabilities for other indications such as deep brain stimulation ("DBS"). The Debtor entered into a development agreement with Aleva Neurotherapeutics, S.A. ("Aleva") in

2016. This agreement provides that the Debtor will leverage its neurostimulation technology platform to develop a DBS system for Aleva to treat Parkinson's disease. As Virtis is not currently commercialized and the DBS system is under development, and the divestiture of NeuroNexus was completed on December 31, 2018, the Debtor's revenue streams in 2019 consisted of product sales of only its Algovita system and development and engineering service revenue from its contract with Aleva.

### 1.   *Algovita Product Sales*

Despite the Debtor's sales efforts, revenues declined in 2019. Revenues for the third quarter ending September 30, 2019 were $9,256,000 as compared to $12,863,000 for the comparable quarter in 2018, a 28% decline.

As a result of filing the Chapter 11 Case, the Debtor ceased product sales of Algovita. The Debtor has continued its clinical support of patients implanted with Algovita devices during the Chapter 11 Case. Prior to the filing of the Chapter 11 Case, the Debtor was still developing its customer base for Algovita, which included distributors in Europe and hospitals, surgery centers, and medical facilities in the United States served through a direct sales force and third-party distributors. Accordingly, customers and patients implanted with Algovita are residents across the United States and in foreign countries.

### 2.   *Cost Structure and Liquidity*

The Debtor's primary need for liquidity has been to fund the startup of its business, the launch and commercialization of Algovita, the development of Virtis, working capital requirements and for general corporate purposes. The Debtor has incurred significant net losses and negative operating cash flows since the Spin-Off. The Debtor's audited financial statements show cash flow from operating activities as a negative $48.2 million for fiscal 2017 and negative $38.7 million for fiscal 2018.

To fund on-going operating losses and declining cash balances, during February 2018 and September 2018, the Debtor completed follow-on common stock offerings, generating net proceeds of approximately $88.8 million. Furthermore, in December 2018, the Debtor generated $5 million in cash proceeds from the divestiture of NeuroNexus. Despite these cash infusions, the Debtor's cash and cash equivalents declined from $99.2 million as of December 31, 2018 to $56.7 million as of September 30, 2019.

In August 2019, the Debtor initiated a restructuring program intended to deliver cost savings of approximately $1.2 million, net, in 2019 and approximately $5.8 million on an annualized basis in 2020 and beyond. Under the restructuring program, the Debtor reduced administrative expenses through consolidation of corporate and support functions, as well as streamlined research and development and sales and marketing expenses to focus resources on key strategic growth areas.

### C.   **The Debtor's Prepetition Capital Structure**

The Debtor has a credit facility, originally entered into and initially funded at the time of the Spin-Off in March 2016 and subsequently amended in February 2017, February 2018,

December 2018, February 2019, and July 2019 (the "Credit Agreement") with Oxford Finance LLC ("Oxford"), as Collateral Agent, and Silicon Valley Bank ("SVB" and collectively with Oxford, and certain other Lenders from time to time, the "Secured Parties").

Prior to the Petition Date, the Credit Agreement consisted of term loan facilities in an aggregate maximum principal amount of $45 million. The term loan facilities are fully funded and are comprised of (i) a $27.5 million Term Loan A ("Term Loan A"), (ii) a $12.5 million Term Loan B ("Term Loan B"), and (iii) a $5 million Term Loan C ("Term Loan C" and collectively with Term Loan A and Term Loan B, the "Term Loans"). The Term Loans each bear interest at a floating rate equal to the prime rate plus 4.15%, with a floor of 8.65%. As of June 30, 2019, the interest rate on the Term Loans was 9.65%. The Debtor pays accrued interest monthly on the Term Loans through March 2020, and for 30 months thereafter the Debtor was schedule to pay accrued interest monthly plus equal payments of principal on the Term Loans. At maturity, which is scheduled to be September 1, 2022, all principal and accrued interest on the Term Loans then outstanding, plus an additional 7.75% of the funded loan amounts (the "Final Payment") will be due and owing.

The Term Loans are secured by a first-priority lien on substantially all of the assets of the Debtor, including, without limitation, all cash, deposit accounts, accounts receivable, equipment, inventory, contract rights, and the Debtor's real property located in Blaine, Minnesota. In accordance with the First Interim Cash Collateral Order (defined below), the Debtor granted the Secured Parties a first priority security interest in its intellectual property, which previously was excluded from the Secured Parties' collateral. Furthermore, the Debtor must maintain its primary operating and investment accounts with SVB, which are further subject to customary control agreements.

The Credit Agreement also contains customary representations and warranties, reporting and other covenants for credit facilities of this kind including prohibitions on the payment of cash dividends on the Debtor's capital stock and restrictions on mergers, sale of assets, investments, incurrence of liens, incurrence of indebtedness and transactions with affiliates. The Debtor is subject to a financial covenant, that required the Debtor to achieve minimum product revenues measured on a quarterly basis. For the quarter ending June 30, 2019, the Debtor was in compliance with the minimum revenue financial covenant. However, for the quarter ending September 30, 2019, the Debtor's revenues did not meet the minimum product revenue financial covenant set forth in the Credit Agreement.

### D.    Events Leading to Bankruptcy

The Debtor has incurred significant operating losses and negative cash flows since the Spin-Off. These losses have resulted in significant declines in its cash balances, despite having raised additional funds from public offerings of its common stock and the sale of NeuroNexus.

In 2019, due in part to product performance issues in the non-implantable components of Algovita, concerns among implanting physicians about the Debtor's financial condition, loss of sales personnel, competitive pressures and a general slowdown in the SCS market, the Debtor experienced material declines in its revenues from Algovita. This decline in revenues further impacted the Debtor's liquidity, gross margin, and operating results. The decline in Algovita

sales resulted in the Debtor being unable to meet its quarterly minimum revenue financial covenants in the Credit Agreement, which failure is an event of default under the Credit Agreement.

The Debtor's operations have also been adversely impacted by the extensions of the FDA's approval of Virtis. The initial submission for Virtis approval was made in January 2017, and the Debtor now expects FDA approval of Virtis sometime in the first half of 2020. The delay in FDA approval negatively impacted the Debtor's stock price and its ability to raise additional funds through public offerings.

There have also been several officers that have left the business since the beginning of 2019, which also adversely impacted the Debtor's ability to operate profitably. First, in early 2019, the Chief Executive Officer resigned. In addition, the President, the Chief Financial Officer, and the General Counsel left their employment with the Debtor.

In July 2019, the Debtor engaged Piper Jaffray & Co. ("Piper") to assist the Debtor in refinancing the Credit Agreement to provide the Debtor additional funds and greater flexibility with respect to the minimum revenue covenants in the Credit Agreement. The Debtor was unable to refinance the Credit Agreement on acceptable terms.

In August 2019, the Debtor publicly announced its intention to explore strategic alternatives. As part of this initiative, the Debtor hired Piper as its exclusive financial advisor to explore the possibility of either a sale, merger, equity offering or other strategic transaction. Piper approached approximately fifty (50) strategic and financial parties with respect to a sale or merger of the Debtor as a whole, a sale of Algovita on a standalone basis, or a sale of Virtis on a standalone basis. The Debtor's significant losses, negative cash flow, declining sales, declining cash balances, debt level, contractual arrangements with Integer, and the on-going FDA approval process of Virtis, combined with its public company structure, were factors in the failure of the strategic alternative process.

On November 12, 2019, prior to commencing the Chapter 11 Case, the Debtor and the Secured Parties entered into a Consent Under Loan and Security Agreement (the "Consent Agreement") pursuant to which the Debtor prepaid the principal outstanding under the Term Loans in an amount equal to $35 million and the Debtor and the Secured Parties reserved all rights with respect to the Final Payment and all other fees that may become due under the Credit Agreement. Pursuant to the Consent Agreement and the Second Interim Cash Collateral Order (defined below), the Debtor, the Creditors' Committee and the Secured Parties have reserved all rights with respect to the Final Payment and all other fees that may become due under the Credit Agreement.

### E.    Events Occurring During the Debtor's Chapter 11 Case

#### 1.    *Bankruptcy Filing and First Day Relief*

The Debtor commenced the Chapter 11 Case on the Petition Date by filing a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor is considered a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On November 18, 2019, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered orders that, among other things:

- Permitted the Debtor to make certain payroll payments to employees and continue certain employee benefit plans and other practices [Dkt. No. 33];

- Approved the Debtor's continued use of its existing cash management system, bank accounts, and business forms on an interim basis [Dkt. No. 34];

- Extended the Debtor's time to file its Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "SOFAs") through December 10, 2019 [Dkt. No. 36];

- Authorized the implementation of certain procedures to protect confidential patient information [Dkt. No. 37];

- Authorized the Debtor to maintain and honor its existing prepetition warranty program on an interim basis [Dkt. No. 38];

- Prohibited utility provides from altering, refusing, or discontinuing services to the Debtor on account of prepetition invoices [Dkt. No. 39];

- Authorized the Debtor to limit notice and established additional notice procedures [Dkt. No. 40];

- Waived the requirement for the Debtor to file a list of equity security holders [Dkt. No. 41];

- Approved the Debtor's payment of certain prepetition taxes on an interim basis [Dkt. No. 42]

- Authorized the Debtor to maintain its existing insurance programs, satisfy all related prepetition obligations in the ordinary course of business, and renew supplement or enter into new insurance programs in the ordinary course of business on an interim basis [Dkt. No. 43];

- Authorized the continued use of cash collateral and the granting of adequate protection on an interim basis [Dkt. No. 44];

- Approved KCC as the Debtor's Claims and Noticing Agent [Dkt. No. 60]; and

- Granted complex chapter 11 bankruptcy treatment [Dkt. No. 51].

On January 2, 2020, the Debtor received authorization on a final basis to (i) maintain its existing insurance programs, satisfy all related prepetition obligations in the ordinary course of business, and renew supplement or enter into new insurance programs in the ordinary course of business [Dkt. No. 143]; (ii) maintain and honor its existing prepetition warranty program [Dkt.

13

No. 144]; (iii) continue use of its existing cash management system, bank accounts, and business forms [Dkt. No. 145]; and (iv) pay certain prepetition taxes [Dkt. No. 142].

**2.** *Schedules and SOFAs and the 341 Meeting*

On December 10, 2019, the Debtor filed its Schedules and SOFAs [Dkt. Nos. 93 & 94]. On December 20, 2019, after the filing of the Schedules and SOFAs, the U.S. Trustee conducted a meeting of Creditors pursuant to section 341 of the Bankruptcy Code.

**3.** *Retention and Employment of Ordinary Course Professionals*

On January 2, 2020, the Bankruptcy Court entered an order authorizing the Debtor's retention of certain professionals to represent the Debtor in matters arising in the ordinary course of its business [Docket No. 150].

**4.** *Retention and Employment of Bankruptcy Professionals*

On January 2, 2020, the Bankruptcy Court also approved the Debtor's retention and employment of the following Professionals to assist in the administration of the Debtor's Chapter 11 Case: (i) Norton Rose Fulbright US LLP ("NRF"), as bankruptcy counsel to the Debtor [Dkt. No. 151]; (ii) Dorsey & Whitney LLP ("Dorsey"), as general corporate counsel to the Debtor [Dkt. No. 154]; (iii) Alvarez & Marsal North America, LLC ("A&M"), as financial advisor to the Debtor [Dkt. No. 155]; and (iv) Stout Risius Ross Advisors, LLC ("Stout"), as the Debtor's investment banker [Dkt. No. 152].  In connection with each of these retention orders, the Court also approved certain procedures for monthly, interim, and final compensation and reimbursement of expenses for Professionals in the Chapter 11 Case [Dkt. No. 149].

**5.** *Appointment of Creditors' Committee*

On November 21, 2019, an Official Committee of Unsecured Creditors (the "Creditors' Committee") was appointed by the U.S. Trustee. The Creditors' Committee consists of: (i) Minnetronix Medical, Inc.; (ii) BRIGHT Research Partners; and (iii) Libra Medical, Inc.  The Creditors' Committee retained Barnes & Thornburg LLP [Dkt. No. 147] and Thompson & Knight LLP [Dkt. No. 148] as its counsel.

**6.** *Usage of Cash Collateral*

In the ordinary course of its business, the Debtor requires cash on hand to fund its working capital, liquidity needs and other routine payables. In addition, the Debtor requires cash on hand to fund the Chapter 11 Case and to run the sale process in order to maximize value for Creditors. Accordingly, during the course of the Chapter 11 Case, the Debtor sought and obtained approval from the Bankruptcy Court to use cash collateral on an interim basis in exchange for providing certain forms of adequate protection to the Secured Parties. Specifically, on November 20, 2019, the Bankruptcy Court entered an Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief (the "First Interim Cash Collateral Order") [Dkt. No. 44]. Additionally, on January 2, 2020, the Bankruptcy Court entered a Second Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III)

14

Modifying the Automatic Stay, and (IV) Granting Related Relief (the "Second Interim Cash Collateral Order") [Dkt. No. 146]. While usage of cash collateral has been on a largely consensual basis throughout the Chapter 11 Case, the Creditors' Committee did file an objection to the Debtor's request to use cash collateral prior to the entry of the Second Interim Cash Collateral Order [Dkt. No. 106], to which the Secured Parties filed a response [Dkt. No. 136]. However, the Creditors' Committee's objection was ultimately resolved prior to the Court's entry of the Second Interim Cash Collateral Order. Furthermore, pursuant to the Second Interim Cash Collateral Order, the Debtor was required to meet certain case milestones, subject to modification by the Court for administrative reasons, including:

- entry of an order approving a bidding procedures motion on or prior to January 15, 2020;

- entry of an order approving a sale of the Debtor's assets on or prior to March 18, 2020;

- filing a plan and a disclosure statement on or prior to January 27, 2020;

- entry of an order approving the adequacy of a disclosure statement on or prior to March 3, 2020;

- entry of an order confirming a plan on or prior to April 3, 2020; and

- occurrence of the effective date of a plan within five (5) days of entry of an order confirming a plan;

A final hearing on the usage of cash collateral is currently set for February 28, 2020, at 10:30 a.m.

### 7.     *The Sale Process*

Prior to the Petition Date, and continuing since the commencement of the Chapter 11 Case, the Debtor has been engaged in a process to monetize its assets. Specifically, in August 2019, the Debtor publicly announced its intention to explore strategic alternatives. As part of this initiative, the Debtor hired Piper as its exclusive financial advisor to explore the possibility of either a sale, merger, equity offering or other strategic transaction. Piper approached approximately fifty (50) strategic and financial parties with respect to a sale or merger of the Debtor as a whole, or one or more sales of assets relative to its existing product, Algovita, or its product under development, Virtis. Shortly after the Petition Date, Piper informed the Debtor that it was unwilling to serve as the Debtor's investment banker in the Chapter 11 Case.

On November 26, 2019, after interviewing several investment banking candidates, the Debtor retained Stout to lead the Debtor's postpetition sale process. Since its retention, Stout has, among other things: (i) managed the Debtor's data room, providing access to multiple parties that have executed confidentiality agreements; (ii) identified approximately sixty (60) potential buyers, including strategic and financial parties (approximately 75% of the parties contacted were previously contacted by Piper in the prior sale process); and (iii) has directly interfaced with multiple additional parties that have expressed interest in acquiring the Debtor's assets.

To comply with the milestones set forth in the Second Interim Cash Collateral Order, on December 20, 2019, the Debtor filed a motion with the Bankruptcy Court seeking approval of, among other things, bid procedures (the "Bid Procedures") for the marketing and potential sale of the Debtor's assets [Dkt. No. 110]. Following an uncontested hearing held on January 9, 2020, the Bankruptcy Court entered the Procedures Order approving the Bid Procedures on January 13, 2020 [Dkt. No. 169]. Pursuant to the Bid Procedures approved by the Court, the deadline for a stalking-horse bidder to enter into a purchase agreement with the Debtor in order to be entitled to bid protections in the form of a break-up fee and expense reimbursement is February 7, 2020. An auction of the Debtor's assets is currently scheduled for February 27, 2020.

## III.    THE CHAPTER 11 PLAN

### A.    Treatment of Claims and Equity Interests Under the Plan

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS**

**ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.**

The Claims against and Equity Interests in the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims and Equity Interest and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS.**

   **1.**    *Administrative, Professional Fee and Priority Tax Claims*

   (a)    Administrative Claims

The Plan Administrator shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim, in Cash, (a) on the later of:  (i) ten (10) Business Days after the Effective Date (or, if not then due, within ten (10) Business Days after the date when such Allowed Administrative Claim is due in the ordinary course of business); (ii) if such Claim is Disputed and is Allowed after the Effective Date, on the date that is ten (10) Business Days after such Claim is Allowed by a Final Order; and (iii) at such later date and upon such terms as may be agreed upon by a Holder of an Allowed Administrative Claim and the Plan Administrator; or (b) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims Filed after the Administrative Claims Bar Date.

   (b)    Professional Fee Claims

All final requests for payment of Professional Fee Claims shall be Filed and served no later than the Professional Fee Claim Bar Date in the manner set forth in the Professional Fee

Order. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims.

The Debtor shall establish and fund the Professional Fee Escrow Account on or prior to the Effective Date. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the Estate. The Plan Administrator shall pay Professional Fee Claims in Cash as soon as reasonably practicable after such Claims are Allowed by Final Order of the Bankruptcy Court. The Estate shall have a reversionary interest in the excess amount, if any, remaining in the Professional Fee Escrow Account when all such Allowed amounts owing to Professionals have been paid in full, and any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Wind-Down Estate and shall be distributed by the Plan Administrator in accordance with the Plan without any further action or order of the Bankruptcy Court.

Professionals shall provide good faith estimates of their Professional Fee Claims for purposes of the Professional Fee Reserve and shall deliver such estimates to the Debtor no later than ten (10) days prior to the Confirmation Hearing; provided that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals. If a Professional does not provide such an estimate, the Debtor may estimate, in its reasonable discretion, the Professional Fee Claims of such Professional.

(c)    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

2.    *Classification of Claims and Equity Interests*

Except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, all Claims against and Equity Interests in the Debtor are placed in consolidated Classes.

The following table classifies Claims against and Equity Interests in the Debtor, collectively, for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that such Claim or Equity Interest or any portion thereof qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated hereunder as a distinct Class for voting and distribution purposes.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2. | Secured Parties' Claim | Impaired | Entitled to Vote |
| 3. | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4. | General Unsecured Claims | Impaired | Entitled to Vote |
| 5. | Equity Interests | Impaired | Deemed to Reject |

**3.**     *Treatment of Claims and Equity Interests*

(a)     *Other Priority Claims (Class 1).*  Except to the extent that a Holder of an Allowed Other Priority Claim has been paid prior to the Effective Date, or agrees to a different treatment in writing with the Debtor or the Plan Administrator, as applicable, or is the subject of an order entered with respect to the treatment of such Other Priority Claim prior to the Effective Date, each Holder of an Allowed Other Priority Claim, in full satisfaction, release and discharge of and exchange for such Claim, shall receive Cash in an amount equal to the Allowed amount of such priority claim in accordance with section 1129(a)(9) of the Bankruptcy Code, on (or as reasonably practicable thereafter) the later of: (i) the Effective Date; and (ii) the date such Claim in Class 1 becomes an Allowed Claim. Notwithstanding the foregoing, to the extent the Allowed amount of an Other Priority Claim asserting priority treatment under sections 507(a)(4) and (5) of the Bankruptcy Code exceeds the statutory cap applicable to such Claim, such excess shall be treated as a Class 4 General Unsecured Claim.

(b)     *Secured Parties' Claim (Class 2).*  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that the Secured Parties agree to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Allowed Secured Parties' Claim (other than the Secured Parties' Deficiency Claim (if any), which shall be treated as a Class 4 Claim (General Unsecured Claim)), the Holders of the Allowed Secured Parties' Claim shall receive Distributions up to the Allowed Secured amount and, at the election of the Secured Parties, the return of any Collateral securing the Allowed Secured Parties' Claim that exists as of the Effective Date; provided, however, that any Collateral that the Secured Parties elect not to have returned to them, shall vest in the Wind-Down Estate (subject to the Secured Parties' Liens) and be liquidated by the Plan Administrator, with the proceeds therefrom distributed to the Secured Parties up to the Allowed Secured amount of the Secured Parties' Claim.  For the avoidance of doubt, the Secured Parties also have a superpriority administrative expense claim in the Chapter 11 Case as provided for in the Cash Collateral Order.  For the avoidance of doubt, all parties' rights with respect to whether the Secured Parties are entitled to receive default interest, post-petition interest and fees, or a

18

make-whole or similar amounts under the Credit Agreement are reserved and preserved.

(c)     *Other Secured Claims (Class 3).*  Except to the extent that a Holder of an Allowed Other Secured Claim has been paid prior to the Effective Date, or agrees to a different treatment in writing with the Debtor or the Plan Administrator, as applicable, or is the subject of an order entered with respect to the treatment of such Claim prior to the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Plan Administrator's option: (i) Cash equal to the Allowed Other Secured Claim; (ii) reinstatement of such Holder's Allowed Other Secured Claim; or (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim.

(d)     *General Unsecured Claims (Class 4).*  Unless otherwise agreed between the Holder of an Allowed General Unsecured Claim and the Debtor or the Plan Administrator, as applicable, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution of the GUC Recovery.  For the avoidance of doubt, Class 4 General Unsecured Claims shall include the Secured Parties' Deficiency Claim (if any).

(e)     *Equity Interests in the Debtor (Class 5).*  All Equity Interests in the Debtor shall be deemed canceled upon the Effective Date.

## IV.     MEANS FOR IMPLEMENTATION OF THE PLAN

### A.     Sources of Consideration for Plan Distributions

The Debtor's Cash on hand, the Sale Proceeds, and any other Cash received or generated by the Debtor or the Plan Administrator, as applicable, shall be used to fund the Distributions to Holders of Allowed Claims against the Debtor in accordance with the treatment of such Claims and subject to the terms provided in the Plan.

### B.     The Plan Administrator

On the Effective Date, the Plan Administrator shall be appointed. The Plan Administrator shall act for the Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). The Plan Administrator shall be vested with all powers and authority set forth in this Plan and the Plan Administrator Agreement and shall be deemed to have been appointed as the Debtor's Estate's representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

On the Effective Date, the authority, power, and incumbency of any and all persons acting as directors and officers (and other employees, as applicable) of the Debtor shall be deemed to have been terminated, and the Plan Administrator shall (i) be appointed as the sole director and sole officer of the Debtor, and (ii) succeed to all of the powers of the Debtor's directors and officers under applicable law or otherwise.  For the avoidance of doubt, on and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement,

19

and further evidence the terms and conditions of the Plan and the Sale Transaction.

Among other things, the Plan Administrator shall be responsible for: (i) winding down the Debtor's business and affairs as expeditiously as reasonably possible; (ii) resolving Disputed Claims; (iii) making all Distributions to Holders of Allowed Claims in accordance with the Plan; (iv) pursuing or otherwise commencing and litigating any Causes of Action (other than those released in the Plan or pursuant to any prior settlement approved by the Bankruptcy Court), and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the Plan Administrator to outweigh the costs associated therewith; (v) filing appropriate tax returns; (vi) administering the Plan in an efficacious manner; and (vii) executing any Sale Transaction Documentation.

The Plan Administrator shall be deemed to be substituted as the party-in-lieu of the Debtor and the Estate in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter..

### C.   Wind-Down Estate; Plan Administrator Assets

As of the Effective Date, and except as otherwise provided in the Plan, all of the Plan Administrator Assets shall vest in the Wind-Down Estate, under the control of the Plan Administrator, free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code; provided, however, for the avoidance of doubt, subject to the Sale Transaction Documentation, the Secured Parties' Liens on any Collateral (including the proceeds thereof) vesting in the Wind-Down Estate, or consent rights under the Credit Agreement with respect to the disposition of such Collateral, shall continue and remain in full force and effect. The Plan shall be considered a motion pursuant to sections 105, 363, 365, and 1141 of the Bankruptcy Code for such relief.

The purpose of the Wind-Down Estate is to monetize and distribute the Plan Administrator Assets. The Plan Administrator Assets include Causes of Action against third parties, including, but are not limited to, (a) preference, fraudulent transfer and other avoidance claims pursuant to chapter 5 of the Bankruptcy Code and state law counterparts, and (b) state and common law claims and Causes of Action.

The vesting of control over the Plan Administrator Assets to the Plan Administrator shall be made for the benefit and on behalf of Holders of Claims receiving a Distribution from proceeds of the Plan Administrator Assets. For the avoidance of doubt, the vesting of the control of the Plan Administrator Assets with the Plan Administrator shall not constitute a transfer of ownership of the Plan Administrator Assets to the Plan Administrator. The Plan Administrator shall not be deemed a successor in interest of the Debtor for any purpose other than as specifically set forth in the Plan. In connection with the appointment of the Plan Administrator, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Administrator will vest in the Debtor under the control of the Plan Administrator and its representatives, and the Debtor and the Plan Administrator are authorized to take all necessary

actions to effectuate the transfer of such privileges.

### D.      Plan Administrator's Fees and Expenses; Wind-Down Budget

Except as otherwise ordered by the Bankruptcy Court, and subject to the terms of the Plan Administrator Agreement, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including attorneys' fees and expenses) made by the Plan Administrator in connection with the Plan Administrator's duties shall be a charge against the Plan Administrator Assets, and be paid without any further notice to or action, order, or approval of the Bankruptcy Court, in Cash if such amounts relate to any actions taken hereunder; provided, however, that the Plan Administrator shall only be reimbursed for its reasonable and documented fees and expenses in accordance with, and subject to, the Wind Down Budget.

### E.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, including the Secured Parties' Claim, satisfaction in full of the portion of the Secured Claim that is Allowed, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest shall be authorized to take such actions as may be reasonably requested by the Plan Administrator to evidence such releases.

Documentation, on the Effective Date all assets shall be transferred to each purchaser free and clear of all Claims, Liens, encumbrances or interests pursuant to sections 363, 365, 1123 and the other applicable sections of the Bankruptcy Code.

### F.      Prosecution and Resolution of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order or otherwise transferred (including, for the avoidance of doubt, pursuant to Sale Transaction Documentation), in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall reserve all rights to commence, prosecute or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which authority shall vest in the Plan Administrator on the Effective Date pursuant to the terms of the Plan.

The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all such Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis, subject to the Wind-Down Budget.

21

No Entity may rely on the absence of a specific reference in the Plan (including the Plan Supplement documents), the Sale Transaction Documentation, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Plan Administrator will not pursue any and all available Causes of Action against them. The Debtor and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan; *provided* that the Debtor before the Effective Date, or the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party in connection with an objection to and resolution of any Claim asserted by such party.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order or otherwise transferred (including, for the avoidance of doubt, pursuant to Sale Transaction Documentation), the Debtor and the Plan Administrator expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of the Plan or Consummation. The Plan Administrator reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

### 1. *Causes of Action Against Integer Related to the Spin-Off*

**The Debtor, together with its advisors, has undertaken a preliminary analysis of potential constructive fraudulent transfer claims against Integer relating to the Spin-Off. Based on this preliminary investigation, the Debtor believes the Estate potentially has a viable Cause of Action against Integer that could inure to the benefit of Estate Creditors. Generally, a constructive fraudulent transfer occurs where (1) a party does not receive "reasonably equivalent value" in exchange for a transfer and (2) the party either (i) was insolvent on the date of the transfer or became insolvent as a result of the transfer; (ii) was engaged in a business for which it had "unreasonably small capital;" or (iii) intended to incur or believed it would incur debts that would be beyond the party's ability to pay when the debt matured. The foregoing summarizes the position of the Debtor based upon its preliminary investigation and is not meant to constitute a complete description of potential claims arising out of the Spin-Off.**

### G.   Books and Records of the Debtor

To the extent not already transferred on the Effective Date, the Debtor shall transfer dominion and control over all of its books and records to the Plan Administrator in whatever form, manner or media those books and records existed immediately prior to the transfer thereof to the Plan Administrator. The Plan Administrator may abandon all such books and records on or after ninety (90) days from the Effective Date, provided, however, that the Plan Administrator shall not dispose or abandon any books and records that are reasonably likely to pertain to

pending litigation in which the Debtor or its current or former officers or directors are a party or that pertain to General Unsecured Claims without further order of the Bankruptcy Court. Pursuant to section 554 of the Bankruptcy Code, Article IV.G. shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the books and records of the Debtor.

### H.   Operations of the Debtor Between the Confirmation Date and the Effective Date

The Debtor shall continue to operate as a Debtor in Possession during the period from the Confirmation Date through the Effective Date.

### I.   Establishment of the Administrative Claims Bar Date

The Confirmation Order shall approve the Administrative Claims Bar Date. Except as otherwise provided in this Article IV.I of the Plan, on or before the Administrative Claims Bar Date, each Holder of an Administrative Claim shall File with the Bankruptcy Court a request for payment of its Administrative Claim and serve a copy thereof so it is received substantially contemporaneous with the Filing on the Plan Administrator, counsel to the Secured Parties, and the U.S. Trustee. The request for payment of an Administrative Claim will be timely filed only if it is actually received by the Bankruptcy Court by the Administrative Claims Bar Date.

Notwithstanding anything in Article IV.I of the Plan, Professionals shall not be required to file a request for fees and expenses arising under sections 328, 330, 331, 363, and 503(b)(2), (3), (4) or (6) of the Bankruptcy Code, on or before the Administrative Claims Bar Date, as they will instead file final fee applications by the Professional Fee Claim Bar Date.

### J.   Terms of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

### K.   Creditors' Committee

Upon the Effective Date, the Creditors' Committee shall dissolve, and its members and Professionals shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case; provided; however, that the Creditors' Committee shall be deemed to continue to exist and have authority to act in the Chapter 11 Case after such date solely with respect to: (i) applications Filed for Professional Fee Claims; and (ii) requests to reimburse expenses sought by a member of the Creditors' Committee; and (iii) defend against appeals of the Confirmation Order, if any.

### L.   Debtor's Professionals

Upon the Effective Date, the Debtor's Professionals shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case; provided, however, that the Debtor's Professionals shall have authority to act in the Chapter 11 Case after such date solely with respect to: (i) applications Filed for

Professional Fee Claims; (ii) motions seeking enforcement of the provisions of the Plan or the Confirmation Order; (iii) review and, if appropriate, objections to any request for compensation or expense reimbursement filed by a Professional (excluding the Debtor's Professionals); and (iv) defend against appeals of the Confirmation Order, if any.

### M.    D&O Insurance Policies

No prepaid D&O Insurance Policy shall be cancelled, and the Debtor's directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies. As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for such is determined to be an executory contract, shall be deemed assumed by the Debtor.

## V.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Plan Administrator shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan with respect to Allowed Claims (other than Allowed Class 4 Claims). All Distributions to Holders of Allowed Claims shall be made pursuant to the terms of Article III.B. of the Plan.

### B.    Subsequent Distributions

Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be distributed as soon as practicable, and in accordance with the terms of this Plan, after such Claim is Allowed by a Final Order of the Bankruptcy Court.

### C.    Delivery of Distributions

#### 1.    *General Provisions; Undeliverable Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the Holders of Allowed Claims shall be made by the Plan Administrator, at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such Holder or (ii) the last known address of such Holder if no proof of Claim is Filed or if the Plan Administrator has been notified in writing of a change of address.

If any Distribution is returned as undeliverable, the Plan Administrator may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Plan Administrator deems appropriate, but no Distribution to any Holder shall be made unless and until the Plan Administrator has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be

made to the Holder without interest from and after the Effective Date through the date of Distribution.   Amounts in respect of any undeliverable Distributions made by the Plan Administrator shall be returned to, and held in trust by, the Plan Administrator until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in Article V.C.2. of the Plan. The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that such discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

### 2.    *Unclaimed Property*

Distributions that are not claimed by the expiration of one year from the Effective Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that one-year period, the right of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim.

### D.    **Manner of Cash Payments Under the Plan**

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator, as applicable, or by wire transfer from a domestic bank, at the option of the Plan Administrator, as applicable.

### E.    **Time Bar to Cash Payments by Check**

Checks issued by the Plan Administrator, as applicable, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Article V.E. of the Plan shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued.   Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim.   After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall become unclaimed property in accordance with section 347(b) of the Bankruptcy Code.

### F.    **Compliance with Tax Requirements**

In connection with making Distributions under this Plan, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.   The Plan Administrator may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit.   Any property so withheld will then be paid by the Plan Administrator to the appropriate authority.   If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the Holder of the

need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.C. of the Plan.

### G.     No Payments of Fractional Dollars and Minimum Distributions

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar. The Plan Administrator shall not be obligated to make any Distribution of less than $10.

### H.     Interest on Claims

Except as specifically provided for in this Plan or the Confirmation Order, interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Claim, or portion thereof, that is a Disputed Claim in respect of the period from the Effective Date to the date such Disputed Claim, or portion thereof, becomes an Allowed Claim and Distributions are made on account thereof. Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, interest shall continue to accrue on the Secured Parties' Claim to the extent the Secured Parties are Secured by Collateral in excess of the amount of Allowed Secured Parties' Claim on the Effective Date, and in which case, the Secured Parties shall be entitled to receive such interest accruing on or after the Petition Date. For the avoidance of doubt, all parties' rights with respect to whether the Secured Parties are entitled to receive default interest or non-default interest under the Credit Agreement are reserved and preserved.

### I.     No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim, shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### J.     Setoff and Recoupment

The Plan Administrator may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any Debtor or Estate may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Administrator on behalf of the Debtor, the Estate, or the Plan Administrator as a successor in interest of any right of setoff or recoupment that any of them may have against the Holder of any Claim.

## VI.    DISPUTED CLAIMS

### A.    No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of the Disputed portion of the Claim unless and until such Disputed portion of the Claim becomes Allowed.  For the avoidance of doubt, any portion of the Secured Parties' Claim that is not Disputed is Allowed and the Plan Administrator shall make Distributions to the Secured Parties on account of the Allowed amount of the Secured Parties' Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a Holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such Holder under the Plan had the Disputed Claim been allowed on the Effective Date.

### B.    Resolution of Disputed Claims

The Debtor and the Plan Administrator, as applicable, shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim immediately before the Effective Date.  Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Equity Interests; (2) to settle or compromise any Disputed Claim or Disputed Equity Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.

### C.    Resolution of Causes of Action

Settlement by the Plan Administrator of any Cause of Action transferred to the Wind-Down Estate shall require: (i) approval only of the Plan Administrator if the amount claimed by the Plan Administrator against a defendant is less than fifty thousand dollars ($50,000); and (ii) approval of the Plan Administrator and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Plan Administrator against a defendant is unliquidated or equals or exceeds fifty thousand dollars ($50,000).

### D.    Estimation of Claims

At any time, the Plan Administrator with respect to all Claims, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or

unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### E.      Objection Deadline

Except as otherwise provided in the Plan, all objections to Disputed Claims, shall be Filed and served upon the Holder of each such Claim by the Claims Objection Bar Date.

## VII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases will be rejected by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) Executory Contracts or Unexpired Leases for which a notice of assumption has been filed pursuant to the assumption and assignment procedures approved by the Bankruptcy Court in the Procedures Order and in connection with any final sale order entered by the Bankruptcy Court, or (c) an Executory Contract that is a D&O Policy that is pending on the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code.

### B.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Claims resulting from the rejection of Executory Contracts and Unexpired Leases pursuant to Article VII.A. of the Plan must be Filed with the Bankruptcy Court and served on the Plan Administrator no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Article VII.B. of the Plan for which proofs of Claim are not timely Filed within that time period shall be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Estate, the Plan Administrator, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article IX. of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan shall be treated as a Class 4 Claim, if such Claim arises out of an Executory Contract or Unexpired Lease solely between the Holder of such Claim and the Debtor or otherwise.

### C.      Modification, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is rejected shall include all modifications, amendments, supplements, restatements or other

agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the Prepetition nature of such Executory Contract or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

### D. Insurance Policies

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, unless specifically rejected by order of the Bankruptcy Court, all Insurance Policies shall be assumed under the Plan as executory contracts, and nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Debtor or the insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder, and all of the Insurance Policies shall continue in full force and effect according to their terms and conditions.

### E. Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtor has any liability thereunder.

## VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The following are conditions precedent to the occurrence of the Effective Date:

**1.** The Confirmation Order has been entered and becomes a Final Order.

**2.** The Debtor has established and funded the Professional Fee Escrow Account.

**3.** The appointment of the Plan Administrator shall have been authorized, approved and confirmed by order of the Bankruptcy Court and such appointment accepted by the Plan Administrator.

**4.** The Plan Administrator Agreement has been duly executed.

**5.** All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effectuated or executed and delivered, as applicable.

**6.** All of the foregoing conditions have been satisfied or waived on or before [_____], 2020, and if not, the Plan shall be null and void in all respects and nothing continued in the Plan or Disclosure Statement shall constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor, prejudice in any manner the rights of the

Debtor or any other Person, or constitute an admission, acknowledgement, offer or undertaking by the Debtor or any other Person.

7.      The Debtor, with the consent of the Collateral Agent and in consultation with the Creditors' Committee, or by order of the Bankruptcy Court, may waive the occurrence of, or modify, any of the foregoing conditions precedent to the Effective Date (except for entry of the Confirmation Order). Any such waiver may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

8.      Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## IX.   INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.   Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and Holders of Claims and Equity Interests.

### B.   Releases

1.      ***Releases by the Debtor and the Estate.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation, the services of the Releasees in facilitating the expeditious implementation of the Plan, the Debtor hereby provides a full release to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtor) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtor, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate and further including those in any way related to the Estate, the Chapter 11 Case or the Plan; provided, however, that the foregoing provisions of Article IX.B.1. of the Plan shall not operate to waive or release the Releasees from any obligation under this Plan, or the Confirmation Order, as applicable, or from any Causes of Action expressly set forth in and preserved by the Plan or any defenses***

*thereto.*

**2.** **Releases by the Releasing Parties.  Notwithstanding anything contained in this Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to forever release, waive, and discharge each of the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever in connection with or in any way relating to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, the Disclosure Statement or the Plan (other than the rights of the Debtor or a Creditor holding an Allowed Claim to enforce the obligations under the Confirmation Order and the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; provided, however, that nothing in Article IX.B.2. of the Plan shall operate as a release, waiver or discharge of any Causes of Action or liabilities unknown to such Person as of the Petition Date arising out of willful misconduct, fraud or criminal acts of any such Released Party as determined by a Final Order.**

**3.** **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B. of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Releasing Parties asserting any Claim or Cause of Action thereby released.**

**C.** **Exculpation**

**Notwithstanding anything contained in the Plan to the contrary, the Releasees shall neither have nor incur any liability to any Entity for any Claims or Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or Disclosure Statement or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Plan; provided, however, that the foregoing provisions of Article IX.C. of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that each Releasee shall be entitled to rely upon the advice of counsel concerning its duties; provided, further, that the foregoing provisions of Article IX.C of the Plan shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.**

### D.    Injunction

**1.    *From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Plan Administrator, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.***

**2.    *Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Debtor in Possession, the Estate, the Plan Administrator, the Wind Down Estate, the Creditors' Committee, their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.***

**3.    *The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, against the Debtor or any of its assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.***

**4.    *Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from*:**

(a)    *commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, its successors and assigns, and its assets and properties*;

(b)    *enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, its successors and assigns, and its assets and properties*;

(c)    *creating, perfecting or enforcing any encumbrance of any kind against any Debtor or the property or estate of the Debtor*;

(d)    *asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or against the property or estate of the Debtor, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim*; or

(e)    *commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder*.

X.      **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and with respect to all matters related to the Chapter 11 Case, the Debtor, the Estate, all property of the Estate and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, secured status or priority of Claims or Equity Interests;

2.      grant, deny or otherwise resolve any and all applications of Professionals for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor was party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date, provided, however, the right of the Plan Administrator to commence actions in all appropriate jurisdictions shall be fully reserved;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX.A., Article IX.B., Article IX.C., and Article IX.D. of the Plan;

10.     enforce the Injunction set forth in Article IX.D. of the Plan;

11.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may

33

be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Case.

## XI.    MISCELLANEOUS PROVISIONS

### A.    Final Fee Applications

The deadline for submission by Professionals of final applications for Bankruptcy Court approval of Professional Fees Claims shall be the Professional Fee Claim Bar Date.

### B.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable. From and after the Effective Date, the Wind-Down Estate shall be liable for and shall pay the fees under 28 U.S.C. § 1930 assessed against the Estate under 28 U.S.C. § 1930 until entry of a final decree closing the case. In addition, the Plan Administrator shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines, until entry of an order closing or converting the case. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be deemed an administrative claim against the Debtor and its Estate.

### C.    Modification of the Plan

Subject to the limitations contained in the Plan: (i) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order (including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code) provided that any such amendments or modifications must be in form and substance acceptable to the Collateral Agent in its reasonable discretion; and (ii) after the entry of the Confirmation Order, the Debtor or the Plan Administrator, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### D.      Revocation of Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtor, the Creditors' Committee, or any other Entity; or (c) constitute an admission of any sort by the Debtor, the Creditors' Committee, or any other Entity. Notwithstanding the foregoing, the Procedures Order shall remain in full force and effect, including with respect to the Debtor's obligations with respect to the Breakup Fee and Expense Reimbursement (each as defined in the Procedures Order).

### E.      Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to the Plan and the Plan Supplement shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### F.      Governing Law and Construction

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Texas, without giving effect to the principles of conflict of laws thereof. Any inconsistency between the Plan and the Confirmation Order shall be construed in favor of and so as to give effect to the Confirmation Order. All exhibits and schedules to the Plan and the Plan Supplement shall be incorporated in the Plan by this reference, as though set forth at length in the Plan.

### G.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Debtor, the Creditors' Committee, or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (i) the Debtor or the Creditors' Committee with respect to the Holders of Claims or Equity Interests or other parties in interest; or (ii) any Holder of a Claim or Equity Interest or other party-in-interest prior to the Effective Date.

### H.      Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental

assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### I.      Section 1125(e) Good Faith Compliance

The Debtor, the Creditors' Committee and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code, and the Confirmation Order shall including a finding of fact to that effect.

### J.      Further Assurances

The Debtor, the Creditors' Committee, the Plan Administrator, all Holders of Claims and Equity Interests receiving Distributions hereunder, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### K.      Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor, the Secured Parties, the Creditors' Committee, or the Plan Administrator in addition to any direction of service of notice by any order, shall be sent by first class U.S. mail, postage prepaid as follows:

(a) If to the Debtor:

> Nuvectra Corporation
> 5830 Granite Parkway
> Suite 1100
> Plano, TX 75024

*with a copy to*:

> Norton Rose Fulbright US LLP
> 2200 Ross Ave., Suite 3600
> Dallas, TX 75201-7932
> Attn:   Ryan Manns
>           Toby Gerber
>           Laura Smith
>           Shivani Shah

(b) If to the Secured Parties:

> (i) if to Oxford:

> > Oxford Finance LLC
> > 133 N. Fairfax Street
> > Alexandria, VA 22314

Attention:  Maryam Zafar
E-mail: mzafar@oxfordfinance.com, LegalDepartment@oxfordfinance.com

(ii) if to SVB:

Justin Mauch
Director
Silicon Valley Bank
15260 Ventura Blvd, Suite 1800
Sherman Oaks, CA 91403
E-mail: jmauch@svb.com

*with a copy to*:

Greenberg Traurig, LLP
1000 Louisiana St., Suite 1700
Houston, TX 77002
Attn:   Shari L. Heyen
David R. Eastlake

(c) If to the Creditors' Committee:

Barnes & Thornburg LLP
225 South Sixth Street, Suite 2800
Minneapolis, MN 55402
Attn:   Connie Lahn
Peter Clark

-and-

Thompson & Knight LLP
811 Main Street, Suite 2500
Houston, TX 77002
Attn:   Demetra Liggins
Steven Levitt

(d) If to the Plan Administrator:

[  ]

-and-

[  ]

37

L.      **Filing of Additional Documents**

On or before the Effective Date, the Debtor may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions in the Plan.

M.      **No Stay of Confirmation Order**

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

## XII.    RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

A.      **Bankruptcy Considerations**

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in the Plan have not been satisfied, or waived (to the extent possible) by the Debtor or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Equity Interests will be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Equity Interests encompass Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides that Holders of Allowed Claims in Class 4 are to receive a Pro Rata share of the GUC Recovery, which will be generated, in part, by the liquidation of certain assets and the prosecution of certain Causes of Action. The potential recoveries from such actions,

however, are unknown. In addition, there can be no assurance that the GUC Recovery will be sufficient to pay the fees and expenses of the Plan Administrator and/or the professionals employed in connection therewith or make any Distributions.

The Plan provides for no Distribution to Class 5. The Bankruptcy Code conclusively deems this Class to have rejected the Plan. Pursuant to section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that this Class is deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes.   The Debtor believes that the Plan satisfies these requirements.

### B.      No Duty to Update Disclosures

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### C.      Representations Outside of this Disclosure Statement

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Equity Interests that are entitled to vote to accept or reject the Plan.

### D.      No Admission

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Equity Interests.

### E.      Tax and Other Related Considerations

The content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Equity Interests should seek advice from their own independent tax, legal, or other professional advisors based on their own individual circumstances.

## XIII.  PLAN CONFIRMATION AND CONSUMMATION

### A.      The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "Confirmation Hearing"). On, or as promptly as

practicable after the filing of the Plan and this Disclosure Statement, the Debtor will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing (the "Confirmation Hearing Notice") will be provided to all known Creditors or their Representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon: (a) the Debtor, Norton Rose Fulbright US LLP (Attn: Ryan Manns), 2200 Ross Avenue, Suite 3600, Dallas, Texas 75201-7932, ryan.manns@nortonrosefulbright.com; (b) counsel for Oxford Finance LLC, the Collateral Agent, Greenberg Traurig, LLP (Attn: Shari Heyen and David Eastlake), 1000 Louisiana Street, Suite 1700, Houston, Texas 77002, heyens@gtlaw.com and eastlaked@gtlaw.com; (c) counsel for the Creditors' Committee, (i) Barnes & Thornburg LLP (Attn: Connie Lahn and Peter Clark), 225 South Sixth Street, Suite 2800, Minneapolis, Minnesota 55402, connie.lahn@btlaw.com and peter.clark@btlaw.com, and (ii) Thompson & Knight LLP (Attn: Demetra Liggins and Steven Levitt), 811 Main Street, Suite 2500, Houston, Texas 77002, demetra.liggins@tklaw.com; and (d) the Office of the United States Trustee, U.S. Department of Justice (Attn: Marc Salitore), 110 N. College Avenue, Suite 300, Tyler, Texas 75702, marc.f.salitore@usdoj.gov (collectively, the "Objection Recipients") so as to be *actually received* no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE OBJECTION RECIPIENTS AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

### B.     Plan Confirmation Requirements Under the Bankruptcy Code

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless

the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### 1.    *Best Interests of Creditors*

The Bankruptcy Code requires that, with respect to an Impaired class of claims or interests, each holder of an Impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor, with the assistance of its Professionals, has prepared the Liquidation Analysis attached hereto as **Exhibit 2**. The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case. In preparing the Liquidation Analysis, the Debtor has taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to liens and security interests. In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Estate.

Based upon the Liquidation Analysis, the Debtor believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of (a) the likelihood that other assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 2.    *Feasibility of the Plan*

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.

Pursuant to the Plan, the Plan Administrator shall be responsible for: (i) winding down the Debtor's business and affairs as expeditiously as reasonably possible; (ii) resolving Disputed Claims; (iii) making all Distributions to Holders of Allowed Claims in accordance with the Plan;

(iv) pursuing or otherwise commencing and litigating any Causes of Action (other than those released in the Plan or pursuant to any prior settlement approved by the Bankruptcy Court), and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the Plan Administrator to outweigh the costs associated therewith; (v) filing appropriate tax returns; (vi) administering the Plan in an efficacious manner; and (vii) executing any Sale Transaction Documentation. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

### 3.    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of Claims or equity interests that is Impaired under a plan, accept such plan. A class that is Unimpaired under a plan is deemed to have accepted such plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is Impaired, unless such plan: (a) leaves unaltered the legal, equitable and contractual rights to which the Claim or the equity interest entitles the holder of such Claim or equity interest; (b) cures any default and reinstates the original terms of such Claim or equity interest; or (c) provides that, on the consummation date, the holder of such Claim or equity interest receives Cash equal to the allowed amount of that Claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which a debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of Claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

4.    *Section 1129(b)*

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all Impaired classes, as long as (a) such plan otherwise satisfies the requirements for confirmation, (b) at least one Impaired class of Claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) such plan is "fair and equitable" and does not "discriminate unfairly" as to any Impaired class that has not accepted such plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

(a)     No Unfair Discrimination

The "no unfair discrimination" test requires that a plan not provide for unfair treatment with respect to classes of Claims or interests that are of equal priority, but are receiving different treatment under such plan.

(b)     Fair and Equitable

The fair and equitable requirement applies to classes of Claims of different priority and status, such as secured versus unsecured. A plan satisfies the fair and equitable requirement if no class of Claims receives more than 100% of the allowed amount of the Claims in such class. Further, if a class of Claims is considered a dissenting class (the "Dissenting Class"), *i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

- Class of Secured Claims. Each Holder of an Impaired Secured Claim either (i) retains its liens on the subject property, to the extent of the allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the effective date of a plan, of at least the allowed amount of such Claim, (ii) has the right to credit bid the amount of its Claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed Secured Claim.

- Class of Unsecured Claims. Either (i) each holder of an Impaired unsecured Claim receives or retains under a plan property of a value equal to the amount of its allowed Claim or (ii) the holders of Claims and interests that are junior to the Claims of the Dissenting Class will not receive any property under such plan.

- Class of Equity Interests. Either (i) each interest holder will receive or retain under a plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under such plan.

The Debtor believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that the Class of Equity Interests is deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Equity Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Equity Interests that are of equal priority.

43

## XIV.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtor: (i) a liquidation of the Debtor's assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed; or (iii) the Debtor's Chapter 11 Case may be dismissed.

### A.       Chapter 7 Liquidation

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because (a) the likelihood that other assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other Professionals, (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. The Debtor has found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### B.       Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Debtor may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtor's assets. However, the Debtor believes that the terms of the Plan provide for an orderly and efficient liquidation of the Debtor's assets and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

### C.       Dismissal of the Debtor's Chapter 11 Case

Dismissal of the Debtor's Chapter 11 Case would have the effect  of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various Creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Debtor's Chapter 11 Case would permit secured Creditors to foreclose upon any assets that are subject to their Liens. Dismissal will also permit unpaid unsecured Creditors to obtain and enforce judgments against the Debtor. The Debtor believes that these actions could lead ultimately to the liquidation of the Debtor's assets under chapter 7

of the Bankruptcy Code. Therefore, the Debtor believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

## XV.   CERTAIN FEDERAL TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.   General

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor, the Wind-Down Estate, and Holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service"). There can be no assurance that the Service will not take a contrary view, and no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, the Wind-Down Estate, or the Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar, and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

### B.   Certain United States Federal Income Tax Consequences to Holders of Allowed Claims

The tax treatment of Holders of Allowed Claims and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

Additionally, Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any Cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash or other property should be attributable to accrued but unpaid interest is unclear. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## XVI.   RECOMMENDATION AND CONCLUSION

In the opinion of the Debtor, the Plan is in the best interests of its Estate, its Creditors, and other interested parties because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtor urges the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

*[remainder of page intentionally left blank]*

Dated: January 29, 2020
        Plano, Texas

**Nuvectra Corporation**

By:     */s/Jennifer Kosharek*
        Jennifer Kosharek
        Chief Financial Officer


*/s/ Ryan E. Manns*
Ryan E. Manns (Texas Bar No. 24041391)
Toby L. Gerber (Texas Bar No. 07813700)
Laura L. Smith (Texas Bar No. 24066039)
Shivani P. Shah (Texas Bar No. 24102710)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
Email: ryan.manns@nortonrosefulbright.com
       toby.gerber@nortonrosefulbright.com
       laura.smith@nortonrosefulbright.com
       shivani.shah@nortonrosefulbright.com

*Counsel for the Debtor and Debtor In Possession*